**KUSAN MANUFACTURING COMPANY, A DIVISION OF KUSAN, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 83–5851, 83–5855.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 24, 1984.

Decided Dec. 7, 1984.

---

William N. Ozier (argued), Bass, Berry & Sims, Nashville, Tenn., for petitioner.

Elliott Moore/Michael Messitte (argued), Deputy Associate Gen. Counsel, John Burgoyne, N.L.R.B., Washington, D.C., for respondent.

Before KEITH and MARTIN, Circuit Judges, and POTTER, District Judge.[*]

PER CURIAM.

Kusan Manufacturing Company petitions for review of a supplemental decision and order of the NLRB, 267 N.L.R.B. No. 121 (1983), finding that Kusan has failed to bargain with District Lodge No. 155 of the International Association of Machinists and Aerospace Workers, AFL–CIO, in violation of section 8(a)(1) and (5) of the National Labor Relations Act. The Board's supplemental decision and order followed an order of this Court, *see Kusan Manufacturing Co. v. NLRB*, 673 F.2d 150 (6th Cir. 1982), which set aside the certification of the Union and directed the Board to conduct an evidentiary hearing on Kusan's objections to a representation election won by the Union. After an evidentiary hearing on Kusan's objections, the Board reaffirmed its earlier decision that Kusan has unlawfully refused to bargain with the Union. It is this order of the Board that Kusan now challenges. The Board has filed a cross-application for enforcement of its order.

The source of the dispute is a representation election held at Kusan's Franklin, Tennessee plant on October 19, 1979. The Union won that election by a vote of 118 to 107. Kusan, however, filed with the Board objections to the conduct of the election. The objections charged that the Union interfered with the election by conducting a poll of the employees prior to the election, threatening and coercing employees during the course of the polling, and distributing copies of the poll to the employees.

In December 1979, the Regional Director of the NLRB investigated Kusan's objections and issued a report recommending that the objections be overruled. The Board affirmed the Regional Director's Re-

[*] Honorable John W. Potter, United States District Judge for the Northern District of Ohio, sitting by designation.

port in April 1980, and certified the results of the election.

Following certification of the election, the Union made, and Kusan refused, a request to bargain. The Union promptly filed an unfair labor practice charge. The Regional Director of the NLRB issued a complaint charging Kusan with violating section 8(a)(1) and (5) of the National Labor Relations Act. Kusan answered by reiterating its objections to the conduct of the election.

The Board granted the Union's motion for summary judgment, finding that Kusan raised no issues that it had not previously raised in the certification proceeding. Kusan sought review of that judgment in this Court. In March 1982, we set aside the certification of the Union and directed the Board to conduct an evidentiary hearing on Kusan's objections. *See Kusan Manufacturing Co. v. NLRB*, 673 F.2d 150 (6th Cir.1982).

Following the evidentiary hearing, the administrative law judge recommended that Kusan's objections be overruled. In August 1983, the Board adopted the administrative law judge's recommendation and reaffirmed its order finding that Kusan has unlawfully refused to bargain with the Union. Kusan now seeks review of that decision.

Kusan's objections center on a petition that Kusan employees who supported the Union circulated among their fellow workers in the days prior to the election. The petition, which bore approximately 100 names, read as follows:

> We, the undersigned, are voting *YES* for the IAM. We don't mind being on the firing line because we know it's something that has to be done. Please join with us. VOTE YES and help us to make Kusan, Inc. a better place to work and earn a living.

It is undisputed that Union organizer Thomas Maynard made copies of the signed petition, was present when many of the signatures were obtained at a union organizing meeting, knew that employees were distributing copies of the petition to their co-workers at the plant, and was present when the petition was distributed on the day before and morning of the election. Kusan contends that the circulation and distribution of the petition constituted impermissible "polling" of the employees by the Union. Because we hold that the activities here did not constitute improper polling, we need not determine whether the polling, if impermissible, could be attributed to the Union.

■ It is the well-settled policy of the National Labor Relations Board that an employer may not conduct a pre-election poll of employees. *See Offner Electronics, Inc.*, 127 N.L.R.B. 991 (1960). Such a poll by an employer is inherently coercive and destroys the "laboratory conditions" necessary to gauge the free, uninhibited choice of the employees. Arguing that "what is sauce for the goose is sauce for the gander," Kusan urges this Court to adopt a *per se* rule that pre-election polling by the union, like pre-election polling by the employer, is inherently coercive and therefore impermissible. We are not persuaded.

■ We endorse the position of the National Labor Relations Board and several other courts that pre-election polling by the union is not inherently coercive. *See Springfield Discount, Inc., d/b/a J.C. Penney Food Department*, 195 N.L.R.B. 921 n. 4 (1972), *enf'd.*, 82 L.R.R.M. 2173 (7th Cir. 1972); *NLRB v. Claxton Manufacturing Co.*, 613 F.2d 1364 (5th Cir.1980); *Louis-Allis Co. v. NLRB*, 463 F.2d 512 (7th Cir. 1972); *Lipman Motors, Inc. v. NLRB*, 451 F.2d 823 (2d Cir.1971). By no stretch of the imagination are employers of unorganized workers and unions seeking to organize those workers equally matched with respect to their powers of or opportunities for the exercise of coercion. As the Court noted in *Louis-Allis Co., supra:*

> An employer in an unorganized plant, with his almost absolute control over em-

ployment, wages, and working conditions, occupies a totally different position in a representation contest than a union, which is merely an outsider seeking entrance to the plant. The opportunity for employer domination and representation is manifest. . . .

463 F.2d at 517 (quoting *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 30 (5th Cir.1969)). This disparity between the disruptive powers of the employer and those of the union convinces us that pre-election polling by the union is not impermissible *per se.*

■ Although pre-election polling by the union is not inherently coercive, an employer may successfully challenge a representation election if he shows that pre-election polling by the union *in fact* was coercive and *in fact* influenced the result of the election. *NLRB v. Claxton Manufacturing Co.*, 613 F.2d 1364 (5th Cir.1980). Here, Kusan has failed to carry its burden of demonstrating the existence of coercive conduct on the part of the Union. In light of this determination, we need not consider the showing required to establish a causal relationship between any coercive conduct and the results of an election.

At the evidentiary hearing that was conducted before the administrative law judge, Kusan presented evidence that employees Etta Jones and Betty Scales Ridley, who were reluctant to sign the union petition, were threatened by pro-union employee Evelyn Beard. Jones testified that Beard, a material handler who was responsible for bringing assembly parts to Jones, said that "if she ever got it in for me, she could make it hard on me. . . ." Ridley testified that Beard told her that "if I didn't sign the [petition], that she was going to kick my ass." Ridley also testified that Beard, after making the threatening statement "just kinda 'chunked' me on my leg."

The administrative law judge discredited the testimony of Jones and Ridley. He found from the record that Jones' troubles with Beard had extended over a long period of time. When examined by counsel for Kusan, Jones testified:

> Q. Did [Beard] ever make any statements to you, that threatened you in any way?
> A. No, not about the—
> Q. Well, either about the petition or otherwise?
> A. Well, she always made it hard on me for some reason.

At another point Jones testified, "[Beard] was a material handler, and she wouldn't give me no parts, and she said she thought I was smart if I asked for parts. I don't know—She just didn't like me for some reason." Jones could not remember whether it was before or after Beard asked her to sign the petition that Beard said "she could make it hard on" Jones.

The administrative law judge also discredited Ridley's assertion that she had been threatened by Beard. Ridley testified that she heard Beard make a similar threat to Jones. Jones flatly denied that Beard had ever made such a threat to her.

Employee Betty Fuller testified that immediately prior to the election quality control inspectors who were pro-union began rejecting abnormally high numbers of parts produced by her. This testimony was discredited by the administrative law judge. He noted that each time an inspector rejects a part the inspector must complete a rejection slip and turn it in to a management supervisor. If pro-union inspectors had been rejecting an abnormally high rate of parts, it would have come to management's attention. Fuller also testified that a union supporter told her that someone had put sugar in the gas tank of an employee's car. The supporter then stated "something in the effect of, you wouldn't want something like that to happen to your car, and have to walk home." In discrediting this testimony, the administrative law judge noted that Fuller could not remember in what context the remark was made. Fuller also testified that she knew of no employee who had sugar put in a gas tank,

that it never happened to her, and that the remark did not affect the way she voted in the election.

Finally, employee Odessa Harris testified that union supporters asked her "practically every day" to sign the petition. The administrative law judge observed that Harris, who testified that, "I can't hardly remember what happened last week, much less three years ago," was very nervous while testifying and was not a credible witness.

■ The credibility determinations made by the administrative law judge and adopted by the Board are entitled to great weight. *Colfor, Inc. v. NLRB,* 678 F.2d 655, 656 (6th Cir.1982); *Randall, Burkhart/Randall Div. v. NLRB,* 638 F.2d 957, 959 (6th Cir.1981); *Westchester Plastics v. NLRB,* 401 F.2d 903, 906–07 (6th Cir.1968). We will overturn those determinations only if they "overstep the bounds of reason." *NLRB v. Union Carbide, Inc.,* 423 F.2d 231, 233 (1st Cir.1970). After a review of the record in this case, considering the evidence offered by Kusan as well as that offered by the Union, we cannot say that the determinations lack sufficient support in the record. The conclusions drawn are well within the wide discretion accorded in determining the fairness of representation elections.

■ After Kusan's initial appeal to this Court and our remand to the Board for an evidentiary hearing, Kusan raised a claim that it had been prejudiced by the delay of three and one-half years between the conduct of the election and the hearing held on its objections. Kusan claims that this delay entitles it to a new election "so that the true wishes and desires of the company's employees can be determined."

This claim is without merit. The administrative law judge afforded Kusan an opportunity to support its claim of prejudice at the hearing. The judge concluded that no prejudice was demonstrated. Kusan adduced no specific evidence that any crucial witness was unavailable at the time of the hearing; indeed, Kusan presented witnesses in support of each of its allegations of objectionable conduct. Moreover, at the time Kusan filed its objections it was free to take affidavits from its own witnesses for subsequent use to refresh their memories.

Delay caused by the necessities of litigation is always regrettable. However, in this as in every instance in which the union prevails in a representation election, the economic burden caused by any delay is borne by the union and the employees, not the employer. If litigation follows a successful representation election, a union may be prevented from bargaining on behalf of its members pending the outcome of the litigation. An employer who confronts the prospect of bargaining with a newly-elected union also confronts an absence of official sanctions for pursuing every avenue to challenge the validity of the representation election. An employer has an economic incentive to prolong the litigation if the costs of litigation are less than the difference between the expected costs of immediate and delayed bargaining. This is not to say that Kusan has pursued dilatory tactics in this case; indeed, Kusan prevailed previously in this Court. It is to say, in this case, that it is the Union who has been prejudiced by the delay.

The petition to set aside the supplemental decision and order of the NLRB is denied and the cross-application for enforcement is granted.