**DAYTON HUDSON DEPARTMENT STORE COMPANY, a Division of Dayton Hudson Corporation, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner,**

**International Union, United Automobile, Aerospace And Agricultural Implement Workers Of America (UAW), Intervenor.**

Nos. 94–6092, 94–6281.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 7, 1995.

Decided March 29, 1996.

Timothy K. Carroll (argued and briefed), John F. Birmingham, Jr., Dykema & Gossett, Detroit, MI, for Petitioner Cross–Respondent.

Joan Hoyte–Hayes (briefed), National Labor Relations Board, Office of the General Counsel, Aileen A. Armstrong, Dep. Associate General Counsel, National Labor Relations Board, Appellate Court Branch, Margaret Gaines Neigus (argued), National Labor Relations Board, Washington, DC, for Respondent Cross–Petitioner.

Jordan Rossen, Nancy Schiffer (argued and briefed), Associate General Counsel, International Union, UAW, Detroit, MI, for Intervenor.

Before: MERRITT, Chief Judge; WELLFORD and BATCHELDER, Circuit Judges.

WELLFORD, Circuit Judge.

Petitioner Dayton Hudson Department Store Company ("Hudson") operates a chain of retail department stores in the Midwest. In 1990, some of the employees of Hudson's store at the Westland Mall in Westland, Michigan, began an effort to organize and bring in the UAW. On May 11, 1990, an authorized ballot of eligible workers took place; 274 votes were cast for the union and 179 against. Thereafter, Hudson filed timely objections with the NLRB, contending that the outcome of the election was tainted by a letter sent to all employees on May 8, 1990.[1]

The letter at issue, mailed just three days before the election, began with the greeting "Dear Fellow Hudson's Employee," contained a number of references to "we" and "us," and addressed anti-union arguments and tactics employed by Hudson. The letter falsely represented, among its other statements, that Hudson "claimed profits of OVER 60 MILLION DOLLARS in our Westland Hudson's store alone last year...."[2] In closing, the letter stated:

> With the UAW on the ballot, we have the opportunity to choose to balance the power between [Hudson headquarters] and us.
>
> By our joining the UAW, we guarantee ourselves a voice in our future. On May 11 vote to give yourself a meaningful voice in decisions that impact your life—VOTE YES FOR THE UAW.

The letter purported to be authored by "Your Fellow Workers/The Westland Employees Organizing Committee," but the UAW concedes that it was actually prepared by a paid UAW representative.

In December 1990, the NLRB overruled Hudson's objections, holding that the letter did not warrant a new election under the standard set forth in *Midland National Life Insurance Co.*, 263 N.L.R.B. 127, 1982 WL 23832 (1982).[3] Accordingly, the Board certified the UAW as the exclusive representative of the Westland bargaining unit. Hudson, nevertheless, refused to negotiate with the UAW based on the company's belief that the union's certification was inappropriate. As a result of this recalcitrance, the UAW filed an unfair labor practice charge against Hudson.

On May 15, 1991, the NLRB ordered Hudson to bargain with the UAW. Two weeks later, Hudson moved to reopen the record on allegations of newly discovered evidence that forged authorization cards were used prior to

---

1. Hudson also contended that the election process was tainted by other incidents involving the UAW, including: 1) a leaflet, handed out only hours before the election, containing inaccuracies; 2) the presence of two UAW officials and a pro-union employee in an area of the store ruled off-limits during the election; and 3) an alleged attempt by a UAW representative to intimidate anti-union employees with a pipe wrench.

2. Both sides agree that this statement was grossly inaccurate. The sales of the Westland Hudson's store in 1989—the year referenced in the letter—totalled $52.5 million and the profits only $1.4 million.

3. In *Midland National Life,* the NLRB held:

> [W]e will no longer probe into the truth or falsity of the parties' campaign statements, and ... we will not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus, we will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is.

*Midland Nat'l Life Ins. Co.,* 263 N.L.R.B. at 133 (footnotes omitted).

the election to generate additional support for the union.[4] The NLRB denied Hudson's motion, holding that the allegations, even if true, were insufficient to warrant a new election under *Midland National Life*, because Hudson had not claimed that the cards were actually shown to any employees.

In October 1991, Hudson petitioned this court for review of the Board's refusal to reopen the record. In *Dayton Hudson Department Store v. NLRB*, 987 F.2d 359 (6th Cir.1993), we remanded the case to the NLRB with instructions to reopen the record and conduct a "full inquiry into such questions as how many authorization cards were forged, the actual use to which those cards were put, when these incidents occurred, and whether and in what context any misrepresentations concerning the cards occurred." *Id.* at 367. This court also instructed the NLRB to re-evaluate the May 8, 1990 letter under the standard posited in *Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d 343 (6th Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985).[5]

A hearing pursuant to remand was held before Administrative Law Judge Ladwig from January 18 to 21, 1994. At this hearing, Hudson attempted to establish its forged cards allegations chiefly through the testimony of John Madgwick, cochairman of the Westland Employees Organization Committee.[6] Madgwick testified that the organization committee had been told that the UAW would not file an election petition until sixty-five percent of the bargaining unit had signed authorization cards. Madgwick further testified that, after an initial period of high interest, card signing slowed down. Fearing that the sixty-five percent mark would not be reached, Madgwick allegedly decided to attempt to revitalize the union's campaign by forging authorization cards. Madgwick testified that the main impetus for this plan was a telephone call from the organization committee's other cochairman, Mary Grab, in which Grab stated that she was going to forge cards to help reach the goal.[7]

Madgwick allegedly forged between ten and twenty cards and gave them to union representative Ray Westfall in a mall restaurant frequented by Hudson employees. According to Madgwick, the plan was to make show of handing the cards to Westfall in order to indicate additional union support in hopes of inducing undecided employees who might be present to "jump on the bandwagon." Madgwick testified that approximately fifty employees signed cards as a result of his activities, and he indicated that union representatives were fully aware that he had forged authorization cards.

At the conclusion of the hearing, ALJ Ladwig reaffirmed the NLRB's order to bargain. ALJ Ladwig found Hudson's forgery allegations to be a "total fabrication" and concluded that the May 8, 1990 letter had not affected the outcome of the election. The NLRB subsequently affirmed Ladwig's findings of fact and conclusions of law. This petition ensued,[8] raising the following issues: 1) whether the NLRB erred in holding that the May 8, 1990 letter did not meet the *Van Dorn* standard for a new election; and 2) whether the NLRB's ruling on the unauthorized cards issue should be overturned due to

---

4. This new evidence was provided primarily by John Madgwick, an employee of and one-time union promoter at Hudson's Westland Mall store. Madgwick alleged, in a statement given on May 10, 1991, that he had personally forged a number of authorization cards.

5. In *Van Dorn*, this court indicated a "reluctance to be bound by the *Midland National Life* rule in every case." *Van Dorn*, 736 F.2d at 348. The *Van Dorn* panel went on to state that

[t]here may be cases where no forgery can be proved, but where the *misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair*

*choice will be affected.* We agree with the Board that it should not set aside an election on the basis of the substance of representations alone, but only on the deceptive manner in which representations are made.

*Id.* (emphasis added).

6. The proof also included a statement and affidavit given by Madgwick in 1991.

7. Grab later testified that this was a "flippant, stupid remark" on her part, and she denied having forged any cards.

8. The NLRB's motion for expedited enforcement of the Board's order, filed roughly one month later, was denied by this court.

circumstances surrounding the remand hearing and certain errors made therein by ALJ Ladwig.

## I. STANDARD OF REVIEW

■ We do not "'lightly set aside the results of a NLRB-supervised representation election.'" *NLRB v. Superior Coatings, Inc.,* 839 F.2d 1178, 1180 (6th Cir.1988) (quoting *NLRB v. First Union Management, Inc.,* 777 F.2d 330, 336 (6th Cir.1985)). A party seeking to overturn the results of a representation election "'has the burden to show that the election was not fairly conducted.'" *Dayton Hudson Dep't Store v. NLRB,* 987 F.2d at 363 (quoting *NLRB v. Bostik Div.,* 517 F.2d 971, 975 (6th Cir.1975)). If the Board's findings are supported by substantial evidence, they will be upheld. *Id.*

## II. THE MAY 8, 1990 LETTER

■ The National Labor Relations Act contemplates "unhampered freedom of choice" in selecting a bargaining representative. *International Ass'n of Machinists, Tool & Die Makers Lodge No. 35 v. NLRB,* 311 U.S. 72, 80, 61 S.Ct. 83, 88, 85 L.Ed. 50 (1940). In attempting to safeguard employees' freedom of choice in the context of campaign statements, the NLRB has stated that it will not set aside an election on the basis of misleading representations alone. *Midland National Life Ins. Co.,* 263 N.L.R.B. at 133. The Board will, however, intervene in "cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is." *Id.*

Although this court has followed *Midland National Life,* it has expressed a reluctance to do so in every case. *See Van Dorn Plastic Mach. Co.,* 736 F.2d at 348. In *Van Dorn,* we held that "[t]here may be cases where no forgery can be proved, but where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected." *Id.*[9] On remand, ALJ Ladwig and the NLRB concluded that the May 8, 1990 letter was not sufficient to warrant a new election under the *Van Dorn* standard. Hudson argues that this conclusion was erroneous.

Hudson maintains that the letter, issued only a few days before the election, impermissibly tainted its outcome. Hudson points out that the UAW's letter was not only untrue, but also deceptive in that it appeared to have been authored by "fellow workers." Hudson argues that this "deception" increased the persuasive force of the misrepresentation to such an extent as to negate voters' freedom of choice on the issue of whether or not to join the UAW.

ALJ Ladwig and the NLRB found no merit in Hudson's position, holding that, although the misrepresentation was gross, it was not sufficiently pervasive or artfully made as to warrant a new election.[10] ALJ Ladwig reached this conclusion because no evidence was offered which showed: 1) that the con-

---

**9.** This court recently elaborated on the *Van Dorn* standard in a case noted by the petitioner after briefs were filed. *See NLRB v. Hub Plastics, Inc.,* 52 F.3d 608, 613 (6th Cir.1995). In *Hub Plastics,* Judge Brown stated

> *Van Dorn* and *Dayton Hudson* stand for the proposition that although employees naturally treat campaign propaganda with skepticism, on occasion a misrepresentation may be, though not a forgery, so artful that this skepticism is overcome, resulting in employees believing that the campaign propaganda must absolutely be true. Such a misrepresentation may also be so pervasive that it is likely to influence a large enough group of employees to have a material effect on the election. While the source of the misrepresentation is certainly one factor in determining a misrepre-

sentation's "artfulness," it is not dispositive. The ways in which a party supports the misrepresentation ... may also be relevant in determining whether the misrepresentation was so artful as to overcome the employees' natural skepticism.

*Id.*

**10.** The ALJ found that the letter was not within the scope of *Midland National Life* either. In this regard, Ladwig stated that

> "an employee could reasonably be expected to recognize the letter as propaganda. It was received from the UAW Region 1, it bore the printed signature of the Union's organizing committee, it was critical of the Company and its antiunion "scare tactics," it was received shortly before the election, and it concluded: VOTE YES FOR THE UAW."

tents of the letter did not mirror the sentiments espoused by the committee while campaigning on behalf of the union; 2) that employees were misled into believing that the pro-union statements in the letter were not obviously campaign propaganda; or 3) that the employees would have any reason to believe that the organization committee members would have any special knowledge of company profits. Ladwig also noted that "among all the campaign propaganda, this was [only] one false statement in one long letter."

Upon reviewing the record, we hold that the ALJ did not err in concluding that the May 8, 1990 letter was insufficient to warrant a new election. It is difficult to assess how many employees may have been affected by the letter's extreme exaggeration of Hudson's profitability. Additionally, we acknowledge that some employees may have been deceived as to the real source of the letter. Nevertheless, in light of the large margin of victory enjoyed by the UAW and the fact that, prior to receiving the May 8, 1990 letter, voters were undoubtedly aware, in general, that the organization committee was allied with the UAW, we are not prepared to reverse the determination of the Board and the ALJ. We note, however, that we are discomforted by the fact that the letter was mailed at such a time as to afford Hudson little opportunity to respond to the gross misrepresentation contained therein. We stress that we will continue to review cases arising under *Midland National Life* and *Van Dorn* very carefully.

## III. THE FORGERY ALLEGATIONS

On remand, ALJ Ladwig ruled against Hudson on the company's assertion that forged cards had tainted the outcome of the representation election at its Westland store. According to the ALJ, Hudson's allegations in this regard were a "total fabrication." The NLRB subsequently affirmed on this issue. On appeal, Hudson argues that ALJ Ladwig erred in concluding that the forged card incident did not occur. Upon reviewing the ALJ's extensive findings, however, we are disposed to conclude that they are supported by substantial evidence. Although the ALJ found witness Madgwick's testimony to be a "total fabrication," we hold only that there are sufficient bases to find for the union on the question of whether alleged forged authorization cards influenced the outcome of the election.[11]

## IV. WAS THERE "FULL INQUIRY" INTO THE FORGERY ISSUE ON REMAND?

■ Hudson finally contends, for a number of reasons, that it was denied the "full inquiry" ordered by this court into its allegations of forged authorization cards. First, Hudson contends that the nearly four year delay between the occurrence of the relevant events in this case and the remand hearing created a perceived lack of credibility on the part of its witnesses due to the fact that their memories had faded. While we regret the length of the disposition in this case and acknowledge that this delay may have had a bearing on the some of the ALJ's credibility rulings, we hold that Hudson suffered no undue prejudice. Hudson had the opportunity to preserve the testimony of its witnesses in affidavits for subsequent use in refreshing their memories, but failed to do so. *See Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 366 (6th Cir.1984).

■ Next, Hudson contends that it was deprived of a "full inquiry" into its forgery allegations by an administrative error on the part of the NLRB. On the second day of the remand hearing, the Board admitted that it had inadvertently returned the authorization cards from the Westland Mall store, originally submitted to the Board in March 1990 along with the UAW's election petition, to the UAW in November 1992. Apparently, the Board was supposed to have returned authorization cards from another Hudson store in connection with a withdrawn election petition filed by the UAW. In any event, the

---

11. We cannot agree that Madgwick's testimony was a "total fabrication," because of Grab's "flippant" remark to Madgwick that she and her family members might also forge names, if needed, to bring in the union. Additionally, Madgwick's reporting of his forgeries to his employer and the union might have been contrary to his interests.

UAW returned 268 Westland cards to the Board approximately two weeks after receiving them.

According to Hudson, this administrative mix-up explains why the alleged forgeries cannot now be located. Hudson theorizes that more than 268 cards were originally filed with the Board and that the UAW, knowing that a hearing was in the offing, culled out the forgeries and returned the remaining cards to the Board. This tampering argument was rejected by the Board as unsupported by any evidence. In fact, the Board noted that counsel for Hudson admitted that there was "no evidence or suggestion that what had been represented by the General Counsel or by [counsel for the UAW] is not entirely true." While Hudson acknowledges this statement, it contends that no "representation was made that all of the cards [originally filed] were returned to the Board. No representations were made regarding the handling of the cards by the UAW while they were in its possession."

Contrary to Hudson's assertions, we do not believe that the Board's mishandling of the authorization cards denied the company sufficient inquiry into the forgery issue.[12] There is simply no credible evidence that more than 268 cards were originally filed with the Board, or that the UAW engaged in any impropriety while in possession of the cards. We do not agree, however, with the Board's assertion that Hudson's argument is merely a feeble "attempt ... to resurrect its forged-cards allegation."

■ Finally, Hudson contends that it was unduly prejudiced by ALJ Ladwig's exclusion of certain testimony on the issue of whether Madgwick had a motive to undermine the election results. We generally review an ALJ's exclusion of evidence in this context for an abuse of discretion. *Manna Pro Partners, L.P. v. NLRB*, 986 F.2d 1346, 1353 (10th Cir.1993); *see Walter N. Yoder &*

*Sons v. NLRB*, 754 F.2d 531, 534 (4th Cir. 1985); *Marathon LeTourneau Co. v. NLRB*, 699 F.2d 248, 254 (5th Cir.1983).

In 1991, Hudson erased an $8,055.79 deficit in Madgwick's account.[13] At the remand hearing, the UAW asserted that this deficit write-off provided a motive for Madgwick to attempt to undermine the election results by concocting allegations of forgery. Hudson attempted to undercut this assertion by eliciting testimony from both Madgwick and Tom Rector, a UAW organizer at the Hudson's in Pontiac, Michigan, that Madgwick had told Rector of his forging activities at Westland and advised Rector to do likewise in connection with an October 1990 representation election at Pontiac. Counsel for the union took the position that whether cards were forged in the Pontiac election, which occurred five months after the Westland election, was irrelevant to the issue of whether cards were forged at the Westland store. ALJ Ladwig agreed, excluding the testimony on grounds that it exceeded the scope of the remand.

We conclude that any error in the exclusion of this testimony was harmless. Even if Madgwick's testimony had been admitted, neither the ALJ nor the Board would have accepted it in light of the fact that they found him to be a "most untrustworthy witness." Similarly, even if Rector's testimony had been admitted, we would still find supported by substantial evidence the ALJ's conclusion that Madgwick had motivation to undermine the representation election.[14]

## V. CONCLUSION

Despite some reservations, we **AFFIRM** the decision of the NLRB in this case based on the analysis above.

12. Furthermore, we conclude that Hudson's argument in this regard is untimely because Hudson failed to raise this issue when the mistake came to light at the remand hearing.

13. The ALJ found that Hudson had also eliminated deficits in the accounts of other commissioned sales consultants during the same time period.

14. In addition to concluding that the deficit write-off motivated Madgwick, the ALJ found that Madgwick was motivated to fabricate the forged cards incident because Madgwick had repeatedly expressed resentment at having to share bargaining responsibility with local UAW president Mary Grab.