NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0393n.06
Filed: June 6, 2006

No. 05-1499

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,

     *Petitioner,*

v.

ROBERT ORR/SYSCO FOOD SERVICES, LLC,

     *Respondent.*

ON APPEAL FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

---

**BEFORE:**    **KEITH and COLE, Circuit Judges; MILLS, District Judge.**[*]

**R. GUY COLE, JR., Circuit Judge.** Respondent Robert Orr/Sysco Food Services, LLC ("Sysco") appeals the Decision and Order of the National Labor Relations Board, adopting a decision by an administrative law judge that Sysco violated Sections 8(a)(1), (3), and (4) of the National Labor Relations Act, 29 U.S.C. §§ 151-169 (the "Act"). For the reasons set forth below, we affirm and enforce the decision of the Board.

**I. BACKGROUND**

Sysco operates a food storage and distribution warehouse in Nashville, Tennessee. Sysco also operates a nearby retail store, known as the Cash and Carry store. On June 14, 2000, a representation election was held among the warehouse and retail store employees. Sysco employees

---

[*]The Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

voted against union representation in an election that was conducted by the National Labor Relations

Board ("Board"). The union challenged the results of the election, arguing that Sysco's conduct

during the campaign interfered with the fairness of the election. Based upon the union's challenge,

the Board, on August 7, 2001, set aside the first election and ordered a second election.

The second election, which the union won, was held on September 6, 2001. Sysco objected to

the results of that election. A hearing was held on the objections in October 2001. After three days

of hearings, the Hearing Officer issued a Report and Recommendation, recommending that Sysco's

objections be overruled in their entirety. While Sysco's appeal of the Report and Recommendation

was pending before the Board, the Board's General Counsel filed a complaint against Sysco,

alleging unfair labor practices, based on charges filed with the Board by Teamsters Local Union,

No. 48. A hearing before an administrative law judge (ALJ) took place from August 12-15 and

September 9-12, 2002. The ALJ issued a Decision on May 9, 2003, concluding that Sysco violated

sections 8(a)(1), (3) and (4) of the National Labor Relations Act, 29 U.S.C. §§ 151-169 ("the Act")

by interrogating employees as to their views on the union, by altering various work rules, and by

soliciting grievances with implied promises to remedy them. Sysco appealed that Decision to the

Board.

On December 16, 2004, the Board issued a Decision and Order (the "Order"), adopting, with

technical modifications, the Decision of the ALJ. The Board now seeks enforcement of its Order.

## I. ANALYSIS

### A. National Labor Relations Act

The Act makes it unlawful for an employer to interfere with the rights of employees to organize. Section 8(a)(1) of the Act makes it unlawful for an employer to interfere with any of the rights guaranteed in Section 7 of the Act, including the right to self-organize; form, join, or assist labor unions, and bargain collectively. *See* 29 U.S.C. §§ 157-58. Section 8(a)(3) makes it unlawful for an employer to discriminate in regard to hire or tenure of employment or any term or condition of employment in order to discourage membership in any labor organization. *See* § 158(a)(3). Section 8(a)(4) makes it unlawful for an employer to discharge an employee for giving testimony in a hearing related to the Act.

**B.  Standard of Review**

We will not disturb the Board's findings of fact if such findings are supported by substantial evidence, which means relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Dupont Dow Elastomers, LLC v. NLRB*, 296 F.3d 495, 500 (6th Cir. 2002) (citing *NLRB v. Pentre Elec., Inc.*, 998 F.2d 363, 368 (6th Cir. 1993)). We do not simply verify that evidence exists to support the Board's conclusions, but rather review the evidence as a whole, including conflicting evidence. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002). We defer to the Board's reasonable inferences and credibility determinations, even if we would conclude differently under *de novo* review. *FiveCAP, Inc. v. NLRB*, 294 F.3d 768, 776 (6th Cir. 2002). We only overturn credibility determinations if they "overstep the bounds of reason," *Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 366 (6th Cir. 1984), or if they are "inherently unreasonable," or "self-contradictory," *Tel Data Corp. v. NLRB*, 90 F.3d 1195, 1199 (6th Cir. 1996).

We review the Board's interpretation of the Act with *Chevron* deference. *FiveCAP*, 294 F.3d at 776. Under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984), we must first determine "whether Congress has directly spoken to the precise question at issue." If Congress has directly addressed the issue, then we must give effect to the statutory text. *Id.* at 842-43. If Congress has not spoken directly, we will not disturb the Board's interpretation as long as it is a permissible and reasonable interpretation of the statute. *Holly Farms Corp. v. NLRB*, 517 U.S. 392 (1996). Finally, questions of law outside of the Act are reviewed *de novo*.

## C.  Cash and Carry Store

Alva Clark, a Cash and Carry store employee, testified that on the Friday before the second election, Willie Swafford, the store's manager, called her from his cell phone and asked Clark about her feelings regarding the upcoming union election. Swafford told her that "he took his own little poll, and he wanted to find out how [Clark] felt about the union." When Clark failed to express an opinion on the matter, Swafford asked if there was anything that could be done to help Clark make up her mind. Several days after the conversation, a memorandum signed by Sysco's president, Nick Taras, was posted on the store's bulletin board, which stated:

> It has come to our attention that during the week of August 13th, Willie Swafford may have asked some of the employees in the Cash and Carry department how they were going to vote in the upcoming election. This conduct was not authorized by Robert Orr - SYSCO. Mr. Swafford was wrong to question you about how you will vote. You have the right to make a choice on whether or not you want a union, without being questioned about your decision. I can assure you that this will not happen again. Further, we at Robert Orr - SYSCO will not interfere with the exercise of your Section 7 Rights guaranteed under the National Labor Relations Act.

Additionally, Sysco's employee relations manager, Karen Catron, and senior vice president, Bart Ivey, met with Cash and Carry store employees. After Clark inforormed Catron and Ivey of her conversation with Swafford, Ivey apologized to Clark, and stated that Swafford "had no right to do that, that he shouldn't have done that, and by doing that, he didn't intend for nobody to be intimidated in which way they need to vote, one way or the other."

An employer that denies its workers the ability to exercise their rights under Section 7 of the Act commits an unfair labor practice pursuant to Section 8 (a)(1). The ALJ and Board concluded that Swafford's actions violated § 8(a)(1) of the Act, insofar as they tended to coerce or interfere with rights guaranteed by section 7 of the Act. Sysco argues that there was no violation, because the questioning was brief, ended without threat or adverse action, did not involve physical intimidation as it took place over the telephone, and was isolated in that Cash and Carry store employees are physically separate from the warehouse employees.

Although it is not unlawful *per se* for an employer to question an employee about his or her union sentiments, especially when the questioning amounts to an isolated event, *see NLRB v. Homemaker Shops, Inc.*, 724 F.2d 535, 548-49 (6th Cir. 1984), substantial evidence supports the finding that Swafford asked other employees about their union sympathies. Clark's testimony that Swafford "took his own little poll" was uncontradicted and fully credited by the ALJ. Furthermore, although the solicitation of grievances during a pre-election period is not a *per se* violation of § 8(a)(1), *see Torbitt & Castleman, Inc. v. NLRB*, 123 F.3d 899, 907 (6th Cir. 1997), it is unlawful to accompany a solicitation of grievances with an implied suggestion that "the grievance will be

resolved or acted upon only if the employees reject union representation," *id*. Here, Swafford specifically asked Clark what he could do to "*help [her] make up [her] mind.*" (emphasis added).

Finally, Sysco argues that even if Swafford's conduct were unlawful, Sysco effectively repudiated that conduct by posting a notice to Cash and Carry store employees. *See Sams Club, a Div. of Wal-Mart Corp. v. NLRB*, 141 F.3d 653, 661 (6th Cir. 1998). In order to be effective, however, the repudiation must be timely, unambiguous, specific in nature to the coercive conduct, and free from proscribed illegal conduct. *Id.* (citing *Passavant Mem'l Area Hosp*., 237 NLRB 138, 138-39 (NLRB 1978)). The ALJ's conclusion that Sysco did not repudiate the conduct because the notice did not cite specific instances of unlawful conduct, stated that Swafford "may have" committed misconduct, and failed to attribute responsibility for Swafford's actions to the company --is supported by substantial evidence.

Clark also testified that before the September 6 election, the degree to which rules were enforced changed. Prior to the election, Cash and Carry employees often talked to one another when no customers were in the store. No policy prohibited such conversations. In fact, it was not uncommon for Swafford to join the conversations. Cash and Carry store employees were permitted to take breaks during the day, fifteen minutes in total, at their discretion. After the election, however, Swafford no longer allowed the employees to talk in groups, and told the employees to "get busy," referring to it as a matter of "job security." Jeremiah Suffrag, a company supervisor, posted a schedule in the window of his office, establishing specific break and lunch times. Employees were then required to take their entire fifteen minutes in a single break, whereas before the election, they were permitted to divide their fifteen minutes into multiple breaks if they so chose.

The Board's conclusion that the change in the break practice at Cash and Carry store shortly before the September 6 election occured in retaliation for the union activity in violation of § 8(a)(1) is supported by substantial evidence. Although Sysco argues that the only change – requiring retail store employees to punch in and out during breaks – is consistent with "good business practices and the treatment of other employees," there is no evidence that supports Sysco's argument that good business practices and fair treatment motivated the change. There is evidence, however, sufficient to support the Board's conclusions, that Sysco's various changes at the Cash and Carry Store in direct response to pro-union activities and not in response to a desire to institute more efficient business practices.

**D. Warehouse**

The balance of the violations of the Act found by the ALJ involve employees in Sysco's warehouse.

**1. Interrogations**

Several warehouse employees testified that management interrogated them about their union views. Tommy Thomas, a pro-union employee, testified that Taras, Sysco's president, questioned Thomas about a company-sponsored meeting regarding the union. After Thomas failed to respond, Taras asked Thomas if he supported the company. Thomas said, "yes, I pull the cases, you know. Of course I support the Company." Thomas testified that Taras then asked him what he wanted from the company. Thomas testified that in a separate incident, Charles Brooks, a supervisor, asked Thomas, "do you support your company?" Brooks told Thomas that he did not need a union, because all unions do is go on strike; and that should there be a union, Thomas would go on strike

and "would not work or make money." He also told Thomas that if there were a strike, Thomas would be the first to be laid off.

James Garza, a non-management warehouse employee, testified that Brooks asked Garza about his views on the union campaign after summoning him into the privacy of his office. Brooks told Garza that the employees did not need a union, and explained his reasoning. Brooks asked Garza, who is bilingual, to speak against unionization to those employees who speak Spanish. Garza testified that later, Todd White, also a supervisor, asked Garza to join him in his office. With the lights off, White asked Garza about a Spanish-speaking employee, and asked Garza to talk with him, because that employee was "telling the Latinos in dry [dock] to vote yes, and was telling [the supervisors that] he was voting no." The supervisor asked Garza to use his influence with the employee "to try to convince him to go our way -- company way."

Chris Shouse, a pro-union employee, testified that Steve Owensby, a supervisor, told Shouse that the employees can lose money and benefits in collective bargaining. Owensby told Shouse that if Shouse voted for the union, Shouse would end up " working for the union and not for Sysco."

The ALJ concluded that each instance of questioning violated § 8(a)(1) of the Act, which prohibits employers from interrogating employees about their opinions regarding unionization. *See Architectural Glass & Metal Co., Inc. v. NLRB*, 107 F.3d 426, 434 (6th Cir. 1997). The test for evaluating the legality of an interrogation is "whether under all the circumstances the conduct tends to restrain, coerce or interfere with rights guaranteed by the Act," *Dayton Typographic Service, Inc. v. NLRB*, 778 F.2d 1188, 1194 (6th Cir. 1985), and requires consideration of the background, the nature of the information sought, the questioner's identity, the place and method of interrogation,

and prior hostility to unionization, *Architectural Glass*, 107 F.3d at 434; *Dayton Typographic Service*, 778 F.2d at 1194.

The ALJ's conclusion as to each incident, adopted by the Board, was supported by substantial evidence. Although Sysco argues that Taras questioned Thomas in a public area, did not ask Thomas how he intended to vote, and did not try to pressure or influence Thomas, it is uncontradicted that Taras is Sysco's president, and that the questioning took place after Taras conducted a meeting during which a speaker discussed his negative experiences with unionization. As for the questioning of Garza, Sysco argues that the Brooks asked Garza how he felt about the campaign, but not about the union itself. There is substantial evidence in the record, however, to support the conclusion that Brooks asked Garza about his opinion of the union, and that Garza only chose to respond in terms of the likely outcome of voting, demonstrating Garza's reluctance to reveal his feelings. Finally, although Sysco argues that it is not always coercive to ask an employee about the general activities of the union, *see Homemaker Shops*, 724 F.2d at 548-49, and *NLRB v. Okun Bros. Shoe Stores, Inc.*, 825 F.2d 102, 108 (6th Cir. 1987), the ALJ and Board correctly concluded that questioning an employee about another employee's union views is nearly always coercive, *see Dayton Typographic*, 778 F.2d at 1195.

**2. Enforcement of Work Rules After the Election**

The record indicates that before the election, warehouse employees regularly ate food in the warehouse in the presence of supervisors without consequence. The record also indicates that, before the election, employees would take breaks and go to lunch whenever they chose to do so, and that it was common for employees to take lunch early. After the election, Brooks told a group of

pro-union employees that management would begin enforcing rules that the warehouse had been lax in enforcing up until that point. Specifically, Brooks stated that the longstanding practice of bringing food outside of the cafeteria would no longer be tolerated, nor would employees be allowed to leave early for breaks. Bob Suter, another supervisor, told employees that "now – everybody has to follow the rules."

An employer violates section 8 (a) (1) of the Act by threatening employees supportive of a union with reprisals. The ALJ concluded that several violations of § 8(a)(1) arose out of unequal or belated enforcement of existing rules, because although rules regarding food and leaving early for breaks existed before the election, the timing of the emphasis on strict obedience of the rules was in retaliation for the vote to unionize, and thus violated § 8(a)(1).

Citing *Syracuse Scenery & Stage Lighting*, 342 NLRB No. 65 at *5 (NLRB 2004), a case in which an employee engaged in both union activity and blatant misconduct, Sysco argues that the Board erred in adopting the ALJ's finding that a violation existed, because a violation of § 8(a)(1) cannot be based on timing alone. Unlike *Syracuse Scenery*, however, there is no evidence here of employee conduct that would warrant Sysco's belated enforcement of the warehouse rules. There is, however, substantial evidence to support the ALJ's factual findings, adopted by the Board, that Sysco began enforcing its food and break policies after the September 6 election, whereas it did not enforce those policies before the election.

### 3. Admonitions

The ALJ noted that shortly before the election, Garza stopped to talk with Jimmy Faulk, an anti-union employee. Garza testified that Brooks told Garza that "it's a little hard to get [production

minimum] when you're engaged in a conversation." Later, when Garza was engaged in conversation with another anti-union employee, Brooks said, "Mr. Garza, why don't you let that man do his job." Additionally, Shouse was chastised by Tony Terrell, a supervisor, for talking to an employee who did not support the union, although the other employee was not chastised. There is no evidence of a company policy against talking among the employees.

The ALJ concluded that these admonitions by Brooks and Terrell violated § 8(a)(1). The Board adopted the ALJ's factual findings and legal conclusions. Sysco argues that Brooks's admonition did not violate § 8(a)(1), but was rather an example of a "supervisor performing his responsibility to make sure that the work to be performed was completed." Undoubtedly, it is a preferred business practice for employees not to disturb others employees, by conversation or otherwise, as they attempt to perform their jobs. There is no evidence in the record, however, that either Shouse or Garza's work was substandard as compared to their anti-union counterparts, or that either was violating a rule against talking. In the context of the overall atmosphere in the warehouse, and Sysco's clear view on unionization, the conclusions of the ALJ and Board are supported by substantial evidence.

### 4. Promotions

Two sanitation jobs became available in August 2001. Tim Toler, an actively pro-union employee, testified that he applied for one of the two jobs. Toler was interviewed for both jobs, and was told that he would begin his job of choice on September 3. When Toler reported to work the next day, White told Toler that there would be a delay in his transfer because of the election; apparently, Taras decided that "there could be no movement while the election was going on." Toler

did not start his job in sanitation until December 2001, although Charles Brooks Sr., Brook's father, began working in the other sanitation job four days after the election, on September 10. Dorothy Merkle, Sysco's human resources manager, testified that Toler was not transferred until December because he went on leave under the Family Medical Leave Act on September 5, and Sysco's policy is to "not allow a person to move if they're in-process for another position, nor can they apply for another position if they're on leave."

The ALJ concluded that Taras's decision to delay employee transfers and promotions violated § 8(a)(1). Sysco argues that the ALJ erred because, rather than finding that the delay in promotion itself violated the Act, the ALJ found the violation in Taras's failure to explain the delay. Sysco cites *Retla Broadcasting Co.*, 302 NLRB 381, 383 (NLRB 1991), as standing for the proposition that the failure to explain the motivation behind an adverse action is only one factor to consider when determining whether a violation of the Act has taken place. *Retla*, however, is consistent with the ALJ's reasoning, and the Board's conclusions, especially in light of the fact that Charles Brooks Sr. was transferred despite the purported freeze.

**E. Discharges**

Beginning on September 7, the day after the union election, Sysco discharged six union supporters.

### a. Tommy Thomas

Sysco has a multi-stage procedure for disciplining employees who fail to work productively, which involves a system of warnings ultimately resulting in termination. Employees are disciplined if they fail to meet minimum production requirements. An employee's production level is defined

as a relationship between volume of work and time. Thus, if an employee is prevented from working for a period of time, that lapse will affect the employee's production level unless the time is adjusted. The record indicates that supervisors adjust time for a variety of reasons, including when supervisors stop to talk with employees and thereby disrupt their production.

During the week before the election, several supervisors stopped Thomas to talk with him, and told Thomas that he should not worry about his time. For example, Brooks interrupted Thomas to discuss pro-company t-shirts, and interrupted him later along with Jeff Suter and Shane Owensby, two other employees, to discuss the possibility of union strikes at other Sysco locations. When Thomas attempted to return to his work duties because of time considerations, Brooks told him to stay. Brooks said "I'll adjust your average," and "don't worry about it, this way we can still keep talking." When Thomas later told Brooks that Brooks had not adjusted Thomas's average as promised, Brooks denied any memory of the conversation.

Section 8(a)(3) of the Act bans "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." Although there was evidence that Thomas's disciplinary record likely supported his discharge at an earlier time, the ALJ concluded that Thomas's discharge was a violation of § 8(a)(3) because Sysco did not enforce its discharge policy prior to the election. This conclusion is supported by substantial evidence. Contrary to Sysco's argument that Thomas was not terminated earlier due to human error-- because Thomas's warnings were issued by different supervisors-- every single warning involved the same two supervisors. Furthermore, Thomas was discharged on September 7, one day after the union vote. "An inference of anti-union animus is proper when the timing of the employer's actions

is 'stunningly obvious.'"  *NLRB v. Aquatech, Inc.*, 926 F.2d 538, 547 (6th Cir. 1991) (citation omitted).  Although Sysco correctly argues that an employer is not required to tolerate unacceptable behavior simply because the employer has done so in the past, *see TNT Logistics of North American v. NLRB*, 413 F.3d 402, 409 (4th Cir. 2005), and *Vulcan Basement Waterproofing of Illinois, Inc.*, 219 F.3d 677, 689-90 (7th Cir. 2000), the ALJ's conclusion, adopted by the Board, that Thomas's discharge was motivated by his union involvement, rather than his performance, is supported by substantial evidence.

### b. Christopher Shouse

Christopher Shouse was discharged after he failed to return to work following a scheduled dinner break on Halloween.  Shouse testified that he did not return from his break because he was searching for his two daughters, who failed to return from "trick-or-treating."  Shouse testified that he attempted to notify a supervisor of his whereabouts, but no one answered the phone.  After eventually finding his daughters, Shouse was able to locate a supervisor, and was told that he would have to talk to Taras about keeping his job.  When Shouse approached Taras the next day, a finalized separation notice documenting Shouse's discharge was already on Taras's desk.  The record reflects that other employees were not discharged for failing to return from breaks without permission.

The ALJ concluded that Shouse's discharge violated both §§ 8(a)(3) and (4), because Shouse was discharged on account of his union activity and his testimony in Board proceedings, which took place on October 17, 2001, just two weeks before his discharge.  Sysco argues that the ALJ erred, because Shouse's testimony regarding the circumstances giving rise to his discharge contradicted the testimony of other witnesses regarding the events of that evening.  We cannot, however, disturb

the ALJ's credibility determination, unless it "overstep[s] the bounds of reason." *Kusan Mfg.*, 749 F.2d at 366. The ALJ's decision to credit the testimony of Shouse over those witnesses giving conflicting testimony does not so overstep those bounds.

### c. James Garza

James Garza was discharged after failing to report immediately that he had damaged Sysco equipment. Garza testified that prior to his union involvement, he had accidentally damaged equipment without consequence. Other employees testified that Sysco employees both have been involved in and failed to report accidents without repercussions. The Board agreed with the ALJ's conclusion that Garza's discharge violated § 8(a)(3) of the Act, because Garza was treated more severely than similarly situated employees because of his union activities.

Sysco argues that the other accidents are materially different from that in which Garza was involved, because Garza's accident created a significantly more dangerous environment. There is no evidence in the record, however, that compels such a conclusion. Whether or not this Court would draw the same inference, the ALJ's conclusion that Garza's accident was materially similar to those other accidents is entitled to deference. *Dayton Newspapers, Inc. v. NLRB*, 402 F.3d 651, 659 (6th Cir. 2005).

### d. James Utley

James Utley, another actively pro-union employee, was discharged after twice failing to meet production minimums. Utley testified that he failed to meet his production minimum during the

week of the election because he spent time talking about the election with Brooks, who explicitly told him not to worry about his time. Although Brooks adjusted the time of Joe Hatley, an anti-union employee, he did not adjust Utley's time. In late February, 2002, Utley was out for several weeks with a knee injury. As soon as he returned to work, Utley was discharged for failing to meet minimum performance levels during the week of his knee injury. Based on Sysco's disciplinary system, the ALJ concluded that had Utley not been disciplined during the week of the election, he would not have been discharged for later failing to meet his minimum production level.

The ALJ's conclusion that Utley's discharge violated § 8(a)(3) is supported by substantial evidence. Although Sysco argues that even if Brooks had credited Utley's time, he would not have met minimum production levels, Utley was more productive than Hatley, whose time was adjusted to discount union-related conversations with Brooks. Given that there is no evidence that Hatley was disciplined for failing to meet production minimums during the week of the election, the ALJ's conclusion, adopted by the Board, that Utley would not have been disciplined that week had Brooks adjusted his time is supported by substantial evidence.

### e. Ben Kelley and Greg Jaster

Ben Kelley and Greg Jaster were both actively pro-union employees, and good friends. On May 15, 2002, the two collided while each was riding his respective "double transporter jack". An argument ensued, during which they swore at one another, and Kelly pushed Jaster's hand away from his face. Bob Suter and Brooks disrupted the argument, and Kelley and Jaster reconciled later that day. Nonetheless, both were discharged two weeks later, ostensibly because their conduct violated Sysco's policy against "hostile physical conduct." During the hearing before the ALJ,

various witnesses testified that an employee once threatened another employee with a shotgun, and that a physically imposing employee chased an employee of much less stature, and had to be physically restrained to prevent him from attacking that employee. None of the employees involved in either incident was disciplined or discharged.

The ALJ concluded that the discharge of Jaster and Kelley violated § 8(a)(3). The Board affirmed, concluding that Sysco had not demonstrated that it had a valid reason for the discharges because the conduct was not serious enough to constitute "hostile physical contact," and because employees who engaged in more serious conduct were not disciplined. Although Sysco argues that the ALJ and Board erred by not crediting Merkle, who testified that Sysco's policy defines any touching as "hostile physical contact," we may not disturb the ALJ's credibility determination, because it does not "overstep the bounds of reason." *Kusan Mfg.*, 749 F.2d at 366. Furthermore, although the nine-month gap between the union election and Jaster and Kelly's discharge is but one factor against a finding of unlawful motive, *see Meco Corp. v. NLRB*, 986 F.2d 1434, 1437 (D.C. Cir. 1993), the trier of fact must examine the "totality of the circumstances," *id*.

Given that other courts have found violations of the Act despite a prolonged period of time between protected activity and discharge, *Globe Security Systems*, 301 NLRB 1219, 1224-25 (NLRB 1991), and the fact that Sysco's objections to the second election were still pending when Jaster and Kelley were fired, the ALJ's conclusion, adopted by the Board, is supported by substantial evidence.

### III. CONCLUSION

For the reasons set forth above, we hereby **AFFIRM** and **ENFORCE** the Order of the Board.

- 17 -