NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

HUB PLASTICS, INC., Respondent.

No. 94–5040.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 31, 1995.

Decided May 8, 1995.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Charles P. Donnelly, Jr., David A. Fleischer (argued and briefed), N.L.R.B., Appellate Court Branch, Washington, DC, for petitioner N.L.R.B.

Jonathan R. Vaughn (argued and briefed), Robert A. Harris, Vorys, Sater, Seymour & Pease, Columbus, OH, for respondent Hub Plastics, Inc.

Before: MERRITT, Chief Judge; BROWN and BATCHELDER, Circuit Judges.

BAILEY BROWN, Circuit Judge.

Respondent Hub Plastics, Inc. ("Company") refused to bargain with the International Brotherhood of Electrical Workers, Local 2020, AFL–CIO–CLE ("Union"), even though the National Labor Relations Board ("NLRB" or "Board") had certified the election results making the Union the exclusive representative of an appropriate unit of the Company's employees. The Union then charged the Company with unfair labor practices under §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158 ("NLRA"). On August 13, 1991, the Board found the Company guilty, and ordered it to bargain with the Union. Almost two and a half years later, on January 11, 1994, the Board filed this petition asking us to enforce its order. For the following reasons, we REMAND the case for findings consistent with the law of this circuit.

## I.

At the outset, we note that the Union has not contested the Company's statement of facts, and the NLRB did not hold a hearing to resolve any factual disputes. It simply ruled for the Union, holding that even if the Company's allegations were true, there were no NLRA violations which would justify setting aside the election. Accordingly, we assume the truth of all of the Company's factual allegations.

On February 14, 1990, the Union filed a petition for an election at the Company's facility in Blacklick, Ohio for a bargaining unit consisting of the Company's production, maintenance and warehouse employees. The election was held on March 29, 1990, and the outcome was extremely close; the final tally, after several ballot challenges, was thirty-two for the Union, twenty-eight against. The Company challenged this election result on several grounds, two of which are implicated in the current enforcement application.

The first allegation involves a Union misrepresentation concerning the Company's alleged unfair labor practices. Throughout the course of the campaign, the Union filed several unfair labor practice charges against the Company, ranging from retaliatory layoffs to a Company supervisor's attempts to run down pro-union employees with his car. On March 26, three days before the election, the NLRB gave notice that it would be issuing a complaint against the Company. In response, the Company met with each shift of the workforce, informing them that it had not acted unlawfully and that an impartial judge would find in its favor.

Two days before the election, on March 27, the Union held a meeting with employees in which the Union falsely stated that the NLRB had made a final determination that the Company was guilty of unfair labor practices. When asked for verification of this statement, the Union pointed to language in the unfair labor practice *charge*, which stated that the employer "has engaged in and is engaging in unfair labor practices." Contrary to the Union's statement, however, the charge was not a final determination of the NLRB, but merely an allegation by the Union. Nevertheless, the misrepresentation apparently had its desired effect. After their meeting with the Union, "employees were heard to say that the company had obviously lied to them about the nature of the NLRB investigation and procedure and that the company was without credibility altogether." *J.A.* at 34–35.

The second reason offered by the Company for setting aside the election concerns two defaced NLRB sample ballots. On the morning of March 23, the Company posted two copies of an NLRB Notice to Employees, which included a sample ballot. About seven hours later, the general manager noticed that someone had penciled an "X" in the union "Yes" box. He removed that notice and posted another one. Three days later, he noticed that the other original sample ballot had been defaced in the same way. This ballot was not replaced, and it remained posted throughout the election.

As noted above, on March 29, 1990, the election was held, resulting in a victory for the Union. On April 5, 1990, the Company filed a number of objections to the election, including those discussed above, with the Regional Director. The Director, without conducting a hearing, reasoned that neither the union misrepresentation nor the defaced

sample ballots had a significant impact on the election, and therefore recommended that the objections be overruled. On July 20, 1990, the Board adopted these recommendations. Significantly, neither the Regional Director nor the Board applied the standard set out in our opinion in *Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d 343, 348 (6th Cir.1984) (discussed *infra* ), *cert. denied,* 469 U.S. 1208, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985). On February 26, 1991, after counting several previously challenged ballots, the Board certified the Union. The Company refused to bargain. The Union then filed an unfair labor practice charge, and on August 13, 1991, the Board found, based on its prior decisions, that the Company had engaged in an unfair labor practice by refusing to bargain with a duly certified union.

The Board, however, did not seek immediate enforcement of this order. Rather, it waited almost two and a half years, giving this "reason" for the delay:

> The delay was due to the fact that, although the Board's Regional Office recommended enforcement within a month after issuance of the Board's decision and order, the branch of the General Counsel's office responsible for instituting enforcement proceedings did not receive this recommendation until shortly before the application for enforcement was filed.

*NLRB's Brief* at 23–24. It seems the NLRB misplaced the enforcement recommendation.

In the meantime, the Company and the employees apparently got on with their lives: the Company went on as it always had, assuming that the NLRB had decided against enforcing its order, and many of the employees who voted in the original election moved on—only twenty-eight of the original sixty employees voting still work for the Company. We assume that the Union, which has not intervened, is still interested in representing the employees.

## II.

In contending that we should deny the petition, the Company makes three argu-

ments: First, the election should have been set aside because the Union, using a Board form, misrepresented to the employees that the unfair labor practice charge was a final determination of the NLRB that the Company was guilty of unfair labor practices; second, the election should have been set aside because the NLRB sample ballots were defaced with a handwritten "X" in favor of the Union; and third, under the doctrine of laches, the order should not be enforced in any event because the Board waited almost two and a half years to apply for enforcement of its bargaining order. We address these arguments *seriatim.*

## III.

Section 7 of the National Labor Relations Act gives workers the right to bargain collectively through representatives of their own choosing. 29 U.S.C. § 157. This necessarily includes the right to a free and fair choice in choosing that representative. *Van Dorn Plastic Mach. Co. v. NLRB*, 736 F.2d 343, 347 (6th Cir.1984). The NLRB has a great deal of discretion in creating standards to effectuate this right, and we have generally upheld these standards as having a "reasonable basis in law." *Id.; NLRB v. Semco Printing Center, Inc.*, 721 F.2d 886, 892 (2d Cir.1983). If the Board applies what we consider the incorrect standard, however, we must deny enforcement and remand the case for reconsideration in light of the proper standard. *See Dayton Hudson Dep't. Store Co. v. NLRB*, 987 F.2d 359, 366 (6th Cir. 1993).

Currently, the Board's position on campaign misrepresentations is that only forgeries affect the employees' free and fair choice sufficiently to justify setting aside an election. In *Midland National Life Insurance Co.*, 263 N.L.R.B. 127, 1982 WL 23832 (1982), which has survived as Board law for over ten years,[1] the Board held:

> [W]e rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will

---

1. The Board's changing views in the area of campaign propaganda are well documented and often noted. *E.g., Van Dorn,* 736 F.2d at 346;

*Dayton Hudson,* 987 F.2d at 364 n. 8; *NLRB v. Affiliated Midwest Hosp., Inc.,* 789 F.2d 524, 527 (7th Cir.1986).

not set elections aside on the basis of misleading campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. Thus, we will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate the forgery for what it is.

*Id.* at 133. The basis for this rule is that employees are "mature individuals who are capable of recognizing campaign propaganda for what it is and discounting it." *Id.* at 132. They know that both the employer and the union have a stake in the election, and that information emanating from these parties should be treated with a great deal of skepticism.

The Sixth Circuit, however, has not endorsed the *Midland* rule as it is stated. In *Van Dorn Plastic Machinery Co. v. NLRB,* 736 F.2d 343 (6th Cir.1984), we stated "[t]here may be cases where no forgery can be proved, but where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected." *Id.* at 348.

In *Dayton Hudson Department Store Co. v. NLRB,* 987 F.2d 359 (6th Cir.1993), we reiterated this view. In that case, a union distributed a letter purporting to be from fellow employees. The NLRB concluded that the letter was not a forgery because "other employees would not reasonably be inclined to assume that the material in [it] originated exclusively from fellow employees and had no input from the UAW." *Id.* at 366 (quotations omitted). Thus, the NLRB in *Dayton Hudson,* as is the case here, did not apply the *Van Dorn* standard. We therefore remanded the case

to enable the Board to reevaluate, in light of our reaffirmation here of *Van Dorn,* whether the [fraudulent] letter, even if not a proven forgery, nonetheless contained misrepresentation and deception pervasive and artful enough to interfere with the employees' free and fair choice to such an extent as to require a new election.

*Id.* at 366. We also remanded the case for a determination of whether the use of forged union authorization cards, although not shown to the employees, constituted a deception pervasive and artful enough to fall within the *Van Dorn* standard. *Id.* at 367.

In the present case, a union official lied to a large group of employees, telling them two days before the election that the Board had conclusively determined that the employer was guilty of unfair labor practices. As support for this deception, the Union showed employees the formal charge it had filed with the Board, which to a layman might appear to be a final determination of the Board.

The substance of this misrepresentation is not enough to void the election, for employees are undoubtedly subject to such prevarications throughout the whole election process. Our concern, rather, is with the manner of the misrepresentation. By supporting its lie with an ambiguous Board form which it showed to a large group of employees, the Union may have engaged in a deception artful and pervasive enough to affect the employees' free and fair choice. The Company contends that this was certainly the case, noting that after the Union's misrepresentation, "employees were heard to say that the company had obviously lied to them about the nature of the NLRB investigation and procedure and that the company was without credibility altogether." *J.A.* at 34–35. The NLRB has made no findings in this regard, however, because, just as in *Dayton Hudson,* the NLRB has refused to apply the *Van Dorn* standard to the misrepresentation at issue here.

In its brief, the Board contends that the *Van Dorn* standard should not apply to situations like the one here where employees know the source of the representation. It states that *Van Dorn* should be viewed "as applying only where, although a document is not actually forged, the employees are so misled as to its authorship that they will view it as something other than campaign propaganda." *NLRB's Brief* at 19. We disagree.

■ *Van Dorn* and *Dayton Hudson* stand for the proposition that although employees naturally treat campaign propaganda with skepticism, on occasion a misrepresentation may be, though not a forgery, so artful that this skepticism is overcome, resulting in employees believing that the campaign propaganda must absolutely be true. Such a misrepresentation may also be so pervasive that it is likely to influence a large enough group of employees to have a material effect on the election. While the source of the misrepresentation is certainly one factor in determining a misrepresentation's "artfulness," it is not dispositive. The ways in which a party supports the misrepresentation, such as using an ambiguous Board form, as is the case here, or using forged union authorization cards, as was the case in *Dayton Hudson,* 987 F.2d at 367, may also be relevant in determining whether the misrepresentation was so artful as to overcome the employees' natural skepticism.

The Board is aware of the *Van Dorn* standard. In the decision under review in *Dayton Hudson,* the Board acknowledged the existence of the *Van Dorn* standard, though it did not apply it, resulting in our remanding the case. *Dayton Hudson,* 987 F.2d at 366. In the present case, a dissenting member of the Board noted in both the decision overruling the Company's objections and the decision certifying the Union that the *Van Dorn* standard should be applied. *J.A.* at 66, 87. The Board's refusal to apply the standard is unexplained.

■ The NLRB has no independent enforcement authority. If it expects us to enforce its decisions, it must apply what we consider, and have stated to be, the proper legal standard. We therefore remand this case for reconsideration in light of *Van Dorn, Dayton Hudson,* and our opinion here. The Board should determine whether the Union's misrepresentation was so artful in its manner and so pervasive in its effect that it affected the employees' free and fair choice to such an extent as to necessitate setting aside the election. A hearing may or may not be necessary to make this determination. We leave that decision to the discretion of the Board.

## IV.

■ The defaced sample ballots raise a similar issue: whether the anonymously placed "X's" in the sample ballot's union "Yes" box affected the employee's free and fair choice by giving the employees the false impression that the Board favored the Union's cause. With regard to altered Board documents, however, the Board employs a slightly different analysis in making this determination. First, it determines whether the altered document on its face identifies the party responsible for its preparation. *SDC Invest., Inc.,* 274 N.L.R.B 556, 557, 1985 WL 45800 (1985). If it does, then the election will stand because, harkening back to the rationale of *Midland,* the employees will know that the document is propaganda, and will treat it accordingly. If the source of the document is not clearly identified, however, then "it becomes necessary to examine the nature and contents of the material in order to determine whether the document has the tendency to mislead employees into believing that the Board favors one party's cause." *Id.* We use a substantial evidence test to review the Board's application of this standard to the facts of a case, upholding any of the Board's reasonable inferences. *NLRB v. Ohio Masonic Home,* 892 F.2d 449, 451 (6th Cir.1989). When the election is a close one, we examine those inferences with great care. *NLRB v. Hyatt Hotels, Inc.,* 887 F.2d 109, 111 (6th Cir.1989).

■ Because the "X's" on the sample ballots were placed anonymously, the Board applied the second step of the *SDC Investment* analysis and adopted the recommendation of the Regional Director, who reasoned that the handwritten "X" did not have a tendency to mislead employees because it was "clearly discernible and sufficiently distinct from the Board's typewritten and printed notice so as to preclude any suggestion that the 'X' was inserted by the Board or that it supported the Petitioner in the election." *J.A.* at 47.

This is a reasonable conclusion we will not disturb. Indeed, we have held that an anonymously handwritten "X" on a sample ballot is insufficient to void an election even under

the Board's now-defunct *Allied Electric Products* rule, 109 N.L.R.B. 1270 (1954), which served to automatically set aside an election if the winning party covertly altered Board documents. In *NLRB v. Fuelgas Co.*, 674 F.2d 529 (6th Cir.1982), we stated:

> To hold, as [the Company] seems to suggest, that a single incident involving an anonymous mark penciled on a sample ballot automatically indicates an unfair election would stretch the rule of *Allied Electric Products*, 109 N.L.R.B. 1270 (1954), and its progeny beyond the limits of reason and common sense.

*Id.* at 531.

Despite the obvious applicability of *Fuelgas*, the Company argues that *NLRB v. Hyatt Hotels, Inc.*, 887 F.2d 109 (6th Cir. 1989), should govern this case. In *Hyatt*, we held that a composite poster containing misspelled pro-union messages in multi-colored magic markers had a tendency to mislead employees because it had the official NLRB caption as its heading. *Id.* at 112. The Company argues that if such an obvious, amateurish forgery could have a tendency to mislead employees, then certainly a plain dark "X" in the union "Yes" box could have the same effect.

Whatever force this contention might have is dispelled by *Hyatt* itself. In *Hyatt*, we specifically distinguished situations involving altered sample ballots, reasoning that "a marked sample ballot is more easily identifiable as propaganda than an altered form which purports to be a notice from the Board." *Id.* at 113. Thus, the Board did not err in concluding that the anonymously placed "X" in the union "Yes" box had no effect on the employees' free and fair choice in choosing a bargaining representative.

## V.

Lastly, there is the issue of the NLRB's failure to pursue this matter in a timely fashion. Unfortunately, we are forced to remand this case because the Board also refused to apply the correct legal standard, causing the delay to continue. Currently, only twenty-eight of the sixty employees who voted in the election still work for the Company. It is possible that the Union no longer enjoys majority status, and a bargaining order could have the effect of imposing an unwanted bargaining representative on a majority of the Company's employees. Furthermore, there is currently no evidence that the large employee turnover was a result of any unfair labor practice by the Company. Indeed, there is the very real possibility that under the *Van Dorn* standard the Company committed no unfair labor practice by refusing to bargain because the Union should never have been certified.

Nevertheless, were we forced to rule on the laches issue today, we would enforce the order under the authority of *NLRB v. Michigan Rubber Products, Inc.*, 738 F.2d 111 (6th Cir.1984). In *Michigan Rubber*, the NLRB waited almost three years before applying for enforcement of its order. Similar to the situation here, the delay was caused by "a breakdown in communications between the office that referred the case for enforcement and the office responsible for seeking enforcement." *Id.* at 112. We enforced the order because "there [was] no allegation that the delay has in any way prejudiced the [Company], or given the Board, or union, an unfair advantage. Absent such a change in relative positions of the parties, the doctrine of laches will not apply." *Id.* at 113.

In this case, the Company states that it was prejudiced by the Board's delay because "[t]he significant turnover that has occurred at Hub since the election changes the relative positions of the parties and calls into question the Union's majority status." *Company's Reply Brief* at 11. It is difficult to see, however, how this fact prejudices the Company. The Company has in all probability saved money from the Board's lack of action. *See Kusan Mfg. Co. v. NLRB*, 749 F.2d 362, 366 (6th Cir.1984). If anything, the delay has prejudiced the employees, who, assuming no NLRA violation under the *Van Dorn* standard, freely voted for union representation and did not receive it.

We also stated in *Michigan Rubber*, however, that "[w]e do not doubt that at some point laches would apply against the Board for inordinate delay in bringing an action." Needless to say, if the Board, after applying

the *Van Dorn* standard, reimposes its bargaining order and asks us to enforce it, even more time will have passed (perhaps aggravated by *additional* inexcusable Board delay), and the bargaining order may seem even more incongruous with the Company's and employees' situation than it seems now. The Company is free to assert the laches argument again in that situation, should the need arise.

## VI.

Accordingly, we REMAND the case to the National Labor Relations Board for proceedings consistent with this opinion.