177 F.3d 573
 161 L.R.R.M. (BNA) 2338
 MAREMONT CORPORATION, A DIVISION OF ARVIN INDUSTRIES,
Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner,
International Association of Machinists and Aerospace
Workers, AFL-CIO (IAM), Intervenor.
 Nos. 98-5042, 98-5130.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 12, 1999.
Decided May 25, 1999.
 
 Robert J. Englehart (argued and briefed), Frederick C. Havard (briefed), National Labor Relations Board, Appellate Court Branch, Washington, D.C., for Respondent.
 Jonathan E. Kaplan (argued and briefed), Tanja L. Thompson, Jay W. Kiesewetter (briefed), Kiesewetter, Wise, Kaplan, Schwimmer & Prather, Memphis, Tennessee, for Petitioner.
 Before: MERRITT, KENNEDY, and GILMAN, Circuit Judges.
 OPINION
 GILMAN, Circuit Judge.
 
 
 1
 Maremont Corporation appeals the National Labor Relations Board's December 31, 1997 Decision and Order finding that Maremont had engaged in unfair labor practices, in violation of 29 U.S.C. §§ 158(a)(1) and (a)(5), by refusing to bargain with the International Association of Machinists and Aerospace Workers, AFL-CIO (the "Union"). The Board cross-appeals for enforcement of the Order.
 
 
 2
 In an election held on August 9, 1996, the Union received the majority of votes cast. Maremont filed several objections to the Union's conduct both before and during the election, arguing that the Union's allegedly objectionable behavior rendered the election invalid. In particular, Maremont contended that the Union's circulation of a "Vote Yes" petition was per se objectionable. Because substantial evidence supports the Board's conclusion that none of the Union's actions prevented Maremont's employees from exercising their free and fair choice in the election, we DENY Maremont's petition for review and GRANT the Board's cross-application for enforcement of its Order.
 
 I. BACKGROUND
 
 3
 Maremont manufactures exhaust systems for automobiles. On June 24, 1996, the Union filed a petition with the Board, seeking a representation election at Maremont's plant in Loudon, Tennessee. On July 11, 1996, Maremont and the Union agreed to hold an election on August 9 of that year.
 
 
 4
 In the weeks preceding the election, members of the Union's In-Plant Organizing Team solicited employees' signatures on a petition stating that the signing employees would "Vote Yes" on August 9. The following language appeared at the top of every page of the petition, above the signature lines:
 
 
 5
 Maremont Corporation has had years to improve our wages, benefits and working conditions and to treat us fairly. They have continuously failed to live up to their promises. Now it's time to give ourselves a chance through representation by the International Association of Machinists and Aerospace Workers.
 
 
 6
 We have made a promise to vote YES on Election Day--August 9th. We have authorized the International Association of Machinists to use our names on handouts to encourage others to VOTE YES.
 
 
 7
 In the August 9 election, 369 votes were cast for the Union, and 272 were cast against it. Maremont filed objections to the election. A hearing was held before an NLRB hearing officer in September and October of 1996. At the hearing, Maremont presented testimony in support of its contention that the Union's actions with respect to the "Vote Yes" petition rendered the election invalid. Several employees called by Maremont testified that they were not aware of the language on the petition, nor of the Union's intention to use their signatures for handouts. Other employees said that Union officials soliciting signatures affirmatively misled them about the purpose of the "Vote Yes" petition, which was eventually turned into a handbill that was distributed among Maremont employees. Finally, several employees testified that they believed they were signing the petition in order to receive Union T-shirts.
 
 
 8
 Employees called by the Union, however, stated that they were aware of the language on, and purpose of, the "Vote Yes" petition. In addition, Union officials testified that they did not deliberately cover up the text on the petition, that they did not prevent any employees from reading it, and that they read the two printed paragraphs on the petition to employees when making home visits.
 
 
 9
 During the course of the election campaign, the Union acquired 446 signatures on the "Vote Yes" petition out of 664 employees eligible to vote. The signatures on the original petition took up 31 pages. One of the Union officials cut and pasted these 31 pages to form a handbill that was only 16 pages long. The cover page of the handbill read as follows:
 
 
 10
 WE, YOUR CO-WORKERS URGE YOU TO JOIN U.S. IN OUR QUEST FOR A BRIGHTER FUTURE ... THE FUTURE STARTS TODAY ... WE ARE VOTING YES.
 
 
 11
 The two paragraphs found on the original petition appear at the top of each of the remaining pages. Beneath the paragraphs were the signatures, arranged in columns. The Union distributed this handbill to Maremont employees on August 8 and 9, 1996.
 
 
 12
 Following the distribution of the handbill, a rumor circulated that if the Union did not prevail in the election, the employees who had signed the "Vote Yes" petition would face retaliation from Maremont. One employee testified that he had heard that the handbill would be used as a "layoff list." The source of the rumor was never verified. In response to the rumor, Maremont issued a flier on August 9 explaining that the rumor had no factual basis.
 
 
 13
 On December 23, 1996, the hearing officer issued her recommendation that the Union be certified as the collective-bargaining representative of Maremont's employees. Maremont objected, arguing that (1) the Union impermissibly obtained employee signatures for its "Vote Yes" petition, (2) the Union propagated an election-day rumor that employees who signed the petition were at risk of being fired in retaliation, (3) a Union training video misleadingly portrayed the NLRB as favoring the Union, and (4) the Union impermissibly bribed employees with T-shirts and other benefits. After reviewing Maremont's exceptions and the hearing officer's recommendations, the Board concluded on September 23, 1997 that the Union should be certified as the employees' collective-bargaining representative.
 
 
 14
 On October 14, 1997, the General Counsel of the Board issued a complaint alleging that Maremont had violated Sections 8(a)(1) and (a)(5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (a)(5), by refusing to bargain with the Union as the certified collective-bargaining representative. The General Counsel then filed a motion for summary judgment, to which Maremont responded. In a Decision and Order dated December 31, 1997, the Board granted summary judgment in favor of the General Counsel, finding that Maremont had violated §§ 8(a)(1) and (a)(5) of the Act by refusing to bargain with the Union.
 
 
 15
 Maremont timely filed a petition for review. The Board then filed a cross-application for enforcement of its Order.
 
 II. ANALYSIS
 A. Standard of Review
 
 16
 Because union election proceedings are not directly reviewable by the courts, an employer desiring a judicial determination of the fairness of an election must refuse to bargain with the union. The election may then be challenged in an unfair labor practice proceeding brought against the employer by the NLRB. See NLRB v. Duriron Co., Inc., 978 F.2d 254, 256 n. 1 (6th Cir.1992).
 
 
 17
 "Congress has vested the Board with considerable discretion in supervising and regulating representation elections." NLRB v. Tennessee Packers, Inc., 379 F.2d 172, 180 (6th Cir.1967). In an effort "to assure employees the greatest freedom of choice in the selection of their representatives," the Board strives to conduct representation elections "in an atmosphere in which employees are free from pressure, coercion and undue influence from either the employer or the union." Id. When a party's pre-election conduct unduly influences the result of an election, "the Board has set aside such election and ordered a new one." Id.
 
 
 18
 A party seeking to overturn the results of a representation election bears "the burden of showing that the election was not conducted fairly." NLRB v. Superior Coatings, Inc., 839 F.2d 1178, 1180 (6th Cir.1988). In order to satisfy its burden, the objecting party must demonstrate that "unlawful conduct occurred which interfered with employees' exercise of free choice to such an extent that it materially affected the result of the election." NLRB v. Shrader's, Inc., 928 F.2d 194, 196 (6th Cir.1991).
 
 
 19
 Because the Board has "broad discretion to determine whether the circumstances of an election have allowed the employees to exercise free choice in deciding whether to be represented by a union," Duriron, 978 F.2d at 256-57, "[t]he Board's findings with respect to whether an election reflected the 'fair and free choice' of the employees 'will not be disturbed on appeal where there is substantial evidence ... to support its conclusions.' " NLRB v. Dickinson Press, Inc., 153 F.3d 282, 285 (6th Cir.1998) (quoting Mitchellace, Inc. v. NLRB, 90 F.3d 1150, 1155 (6th Cir.1996)). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Accordingly, we may not displace the Board's reasonable inferences "even though [we] might justifiably have reached a different conclusion had the matter been before [us] de novo." Tony Scott Trucking, Inc. v. NLRB, 821 F.2d 312, 313 (6th Cir.1987).
 
 
 20
 B. The Union's alleged misrepresentations were not so deceptive as to render the employees unable to separate truth from untruth
 
 
 21
 Although Maremont states its objection to the election in terms of several discrete attacks upon specific Union actions, the crux of Maremont's argument is that the Union used deceit to trick the employees into voting for the Union. Maremont's theory is as follows: First, the Union obtained signatures on its petition by misrepresenting to employees that (a) their signatures would be kept confidential, (b) the petition was a sign-up sheet for T-shirts, and (c) the petition would not be used as a handbill. Second, the Union cut and pasted the signatures into a handbill containing language that many allegedly had not read, and distributed it among the employees. Finally, the Union spread a rumor that persons whose names appeared on the handbill would be retaliated against if the Union did not prevail.
 
 
 22
 In reviewing this theory and Maremont's specific objections, the hearing officer determined that the Union's misrepresentations, if any existed, were not so egregious as to justify setting aside the election. The standard for setting aside an election is as follows:
 
 
 23
 There may be cases where no forgery can be proved, but where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected. We agree with the Board that it should not set aside an election on the basis of the substance of representations alone, but only on the deceptive manner in which representations are made.
 
 
 24
 Van Dorn Plastic Mach. Co. v. NLRB, 736 F.2d 343,348 (6th Cir.1984). See also Contech Div., SPX Corp. v. National Labor Relations Board, 164 F.3d 297, 307 (6th Cir.1998) (holding that letters from the union during an election campaign containing arguably misleading statements did not affect the employees' right to a free and fair choice).
 
 1. "Vote Yes" petition
 
 25
 Maremont argues that the Union's use of a "Vote Yes" petition is per se objectionable. We decline to adopt this argument, as did a panel of this court in Kusan Manufacturing Co. v. National Labor Relations Board, 749 F.2d 362, 364 (6th Cir.1984). In Kusan, the employees circulated copies of a petition that read:
 
 
 26
 We, the undersigned, are voting YES for [the union]. We don't mind being on the firing line because we know it's something that has to be done. Please join with us. VOTE YES and help us to make Kusan, Inc. a better place to work and earn a living.
 
 
 27
 Id. The Kusan court held that although pre-election polling by an employer is per se objectionable, a union seeking to represent employees has a different relationship to them that makes pre-election polling less coercive. See id. Because we agree that "Vote Yes" petitions are not per se objectionable, we look to the facts of the present case to determine whether the petition in question in fact interfered with the employees' free and fair choice.
 
 
 28
 In this case, the hearing officer specifically found that the Union's alleged tactics in obtaining signatures on the petition forms were not deceptive. Her report states that the employees who failed to see the language "engaged in, at best, a cursory or superficial review of the documents they were signing. Even assuming the 'vote yes' petition was given to employees on a clipboard or with the top of the page otherwise obscured, it would have been a simple matter for employees to uncover the top portion of the document and review it thoroughly."
 
 
 29
 Substantial evidence supports the conclusion of the hearing officer that the Union's method of obtaining signatures was not so deceptive as to rob employees of their free choice. In Contech, this court noted that "[i]f absolute objectiveness and pristine conduct were required in order to sustain an election, then virtually none would survive the rough and tumble of labor-management contentiousness." 164 F.3d at 307-08. In the present case, Maremont essentially argues that an election is voidable whenever a number of employees sign folded pieces of paper presented by union organizers without bothering to check what is on the obscured portion. We disagree, and hold that this is an insufficient basis to overturn an election.
 
 
 30
 The hearing officer further found that the Union's only purpose in cutting and pasting the 31 pages of signatures for the handbill was to cut down on photocopying costs. Her report specifically credits the testimony of the Union representative who created the handbill. This court must give deference to the Board's credibility findings. In reviewing such findings, we ask only whether the conclusions are reasonable in light of the proven facts. See National Labor Relations Board v. General Sec. Serv. Corp., 162 F.3d 437, 441 (6th Cir.1998). The hearing officer specifically found, and Maremont does not contest, that none of the signatures was a forgery. We will therefore not disturb the hearing officer's credibility determination.
 
 
 31
 The hearing officer also found that the handbill itself did not interfere with the employees' free and fair choice because it "appears to be a typical partisan leaflet used by a party to an election." No evidence was presented that the actual contents of the handbill tainted the election by misleading the employees.
 
 2. Election-day rumor
 
 32
 The final stage of the Union's alleged strategy of deceit was the rumor that the handbill would be used as a "layoff list" if the Union did not prevail. Maremont presented no evidence that the Union was the source of this rumor. Furthermore, Maremont's theory that this rumor interfered with the employees' free and fair choice or created an atmosphere of fear and intimidation among them is contradicted by the fact that 77 more employees signed the "Vote Yes" petition than actually ended up voting for the Union. Even if we were to infer from this fact that those 77 employees were misled about the petition, it still tends to show that they exercised their free choice in finally determining whether to be represented by the Union.
 
 
 33
 The hearing officer's report also notes that Maremont responded to the rumor with a publication of its own. On the day of the election, Maremont issued a flyer that stated as follows:
 
 
 34
 The Company will not use any list provided by the IAM for anything, and the Company will not retaliate against any one because they might have engaged in some sort of Union activity. The Company has never retaliated against anyone who supported the Union, or signed a card, or wore a Union shirt, or did anything else for the Union,--and will not retaliate against anyone this time either!
 
 
 35
 Because Maremont had a chance to respond to the rumor, its allegedly misleading effects were reduced.
 
 3. Mock-election video
 
 36
 Maremont also objects to the Union's use of a mock-election video in the weeks leading up to the election, and argues that the Union's failure to produce this video at the hearing should create an adverse inference that the video was, in fact, misleading about the neutrality of the Board. In the dramatization, a "Board official" presides over an election in which the Union prevails. The hearing officer found that because the video was shown at Union meetings, it was clear to viewers that it was partisan propaganda, and not Board-issued material. We agree with the Board's finding that the video did not improperly imply that the Board supported the Union.
 
 4. Union "bribery" of employees
 
 37
 Finally, Maremont claims that the Union impermissibly "bribed" the employees with T-shirts and other benefits. The evidence in this case does not support this objection. The hearing officer found that "[t]he overwhelming majority of employees who testified at [the] hearing testified consistent with the testimony of Union officials that employees were not required to sign [the 'Vote Yes' petition] in order to receive campaign items." See Dickinson Press, 153 F.3d at 286 (holding that although the distribution of economic inducements generally constitutes objectionable conduct, a union may distribute inexpensive campaign propaganda such as T-shirts at a union meeting).
 
 III. CONCLUSION
 
 38
 For all of the reasons stated above, we DENY Maremont's petition for review and GRANT the Board's cross-application for enforcement of its Order.