## NATIONAL LABOR RELATIONS BOARD, Petitioner,

United Steelworkers of America, AFL–CIO–CLC, Intervenor,

v.

## GORMAC CUSTOM MANUFACTURING, INC., Respondent.

No. 98–5830.

United States Court of Appeals, Sixth Circuit.

Argued July 20, 1999.

Decided Sept. 3, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied Nov. 10, 1999.

Richard A. Cohen (briefed), David Habenstreit, National Labor Relations Board, Office of General Counsel, Aileen A. Armstrong, Dep. Asso. Gen. Counsel, John D. Burgoyne (argued and briefed), Peter Winkler, National Labor Relations Board, Appellate Court Branch, Meredith L. Jason, National Labor Relations Board, Washington, DC, for Petitioner.

David R. Jury (argued and briefed), United Steelworkers of America, AFL–CIO–CLC, Pittsburgh, PA, for Intervenor.

John T. Billick (briefed), Seth P. Briskin (argued and briefed), Belkin, Billick & Harrold, Cleveland, OH, for Respondent.

Before: WELLFORD, SILER, and GILMAN, Circuit Judges.

WELLFORD, J., delivered the opinion of the court, in which SILER, J., joined. GILMAN, J. (pp. 751–53), delivered a separate dissenting opinion.

## OPINION

WELLFORD, Circuit Judge.

█ The National Labor Relations Board petitions·this court pursuant to 29 U.S.C. § 160(e) for enforcement of its order requiring Gormac Custom Manufacturing, Inc. ("Gormac") to bargain. The NLRB ruled that the company violated sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain with the United Steelworkers of America

("USWA"), the elected and certified bargaining representative of the company's designated unit of employees.[1] Gormac attacks the validity of the certification and contends that it was entitled to an evidentiary hearing on its objections to the representation election.[2] For the following reasons, we **REVERSE** the NLRB's decision and **REMAND** for an evidentiary hearing.

### I.

In an election to determine whether the USWA would collectively represent a proposed bargaining unit of employees of respondent Gormac, held May 21, 1996, consisting of forty-five eligible voters, nineteen cast ballots for USWA, sixteen against, and four ballots were challenged.[3] Two things are apparent from this outcome: (1) a switch of several votes would affect the outcome of this close contest, and (2) for some unexplained reason, six of forty-five eligible voters did not vote—some thirteen percent. Had just half of these absentees voted, the outcome might have been different.

The basis of Gormac's objection to the election and its results is set out in the NLRB regional director's report dated July 25, 1996:

[D]uring the lunch period on June 14, 1996, within three hours of the start of the election, the Petitioner [union] distributed a leaflet[4] to voters which listed the names and purported signatures of 31 Gormac employees who expressed their intent to vote in favor of the Union. The Employer contends that the docu-

1. This unit is defined as follows: "All full-time and regular part-time production and maintenance employees employed at the Employer's North Lima facility, excluding all office clerical employees, guards and supervisors as defined in the Act."

2. "Because union election proceedings are not directly reviewable by the courts, an employer desiring a judicial determination of the fairness of an election must refuse to bargain with the union. The election may then be challenged in an unfair labor practice pro-

ceeding brought against the employer by the NLRB." *Maremont Corp., A Division of Arvin Industries v. NLRB*, 177 F.3d 573, 576 (6th Cir.1999) (citing *NLRB v. Duriron Co., Inc.*, 978 F.2d 254, 256 n. 1 (6th Cir.1992)).

3. We are not concerned in this opinion with the legality of the challenge; we confine ourselves to Gormac's request for a hearing on the fairness of the election itself.

4. The flyer/leaflet is attached as an exhibit to this opinion.

ment misrepresented the Union's majority status, created a false impression of union support and violated the confidentiality of the showing of interest. The Employer further contends that the Petitioner's use of employee signatures was unauthorized, the signatures were used in an [sic] deceptive manner, which was tantamount to forgery, and that the employer had insufficient opportunity to respond to the leaflet.

In support of its objections the Employer submitted affidavits of employees who testified that, a few hours prior to the election, the Petitioner distributed a leaflet which contained their names and signatures. The document was captioned "We're the majority! We're voting yes!" The three employees who submitted affidavits stated that, although their names were on the union leaflet, they had voted "no" in the election and they never authorized the Petitioner to use their names in conjunction with pro-union leaflets.

The leaflet contains the following language [in lower case and in lighter print]: " *The names listed on this leaflet represent Gormac workers who authorized the USWA to use their names on union leaflets."

JA 35 (footnote omitted.) USWA denied the charges and any misrepresentation, according to the regional director. Because the authorization form used by USWA at the outset of its organizing campaign contained, among other things, language that USWA might "sign" the employee's "name to union leaflets," the regional director

deemed the Gormac objection to be "without merit."

There is no evidence in the appendix that the union itself responded to Gormac's objection. Despite respondent's objections to the regional director's report, the NLRB decided, without a hearing or apparently any response by USWA, and with reference to the brief employee "authorization" cards,[5] that the objections were meritless. The NLRB decided that "even if oral misrepresentations were made to these employees regarding the confidentiality of their signatures," the use made by the union in publishing the late hour leaflet at issue did not constitute a violation of the Board's *Midland National Life Ins. Co. v. Local 304A*, 263 NLRB 127, 131, 1982 WL 23832 (1982) rule.[6] It was not a pervasive deception nor misrepresentation "artful enough to interfere" with a "fair and free choice," according to the Board. *See Dayton Hudson Dept. Store v. NLRB*, 987 F.2d 359, 366 (6th Cir.1993).

In due course, Gormac has brought an appeal to this court for the NLRB's refusal to afford it a hearing on the fairness and legality of the election in light of the last-hour's circulation by the union of the flyer in question which contained the purported signatures of thirty-one employees, a substantial majority, and an indication that they would be voting "yes" for the USWA. As indicated above, the Board held that even if oral misrepresentations about confidentiality were made by the union to employees to obtain signatures on the "authorization" cards, this constituted no violation of the Act.

5. The authorization cards at issue read as follows: "I hereby authorize the United Steelworkers of America to represent me for purposes of collective bargaining with my employer. This further authorizes the Union to send my name to the National Labor Relations Board and sign my name to union leaflets." JA 54.

6. The *Midland* rule is as follows:

[W]e rule today that we will no longer probe into the truth or falsity of the parties' campaign statements, and that we will not set elections aside on the basis of mislead-

ing campaign statements. We will, however, intervene in cases where a party has used forged documents which render the voters unable to recognize propaganda for what it is. thus, we will set an election aside not because of the substance of the representation, but because of the deceptive manner in which it was made, a manner which renders employees unable to evaluate forgery for what it is.

*Id.* at 132. We have subsequently modified this rule in the case of *Van Dorn Plastic Mach. Co. v. NLRB*, 736 F.2d 343 (6th Cir. 1984), which we will discuss *infra*.

## II.

### A.

Gormac argues that the regional director and/or the NLRB should have held an evidentiary hearing on its objections to the election. It contends that the affidavits of the three employees, which averred, contrary to the public indications of the union leaflet, that they were assured by union representatives that the cards they signed would be kept "confidential." Furthermore, these three employees stated that they had *not* signed the leaflet in question and/or that their purported "yes" signatures were forgeries. The regional director, without any hearing, stated that the union denied (in a fashion unknown so far as the record reflects) that "it misrepresented its purpose or intent in any manner." The three employees specifically also set forth in their respective affidavits that when they were persuaded to sign the "petition" during the early days of the organizing campaign, they were "told that the petition would *only* be used to obtain a union representation election." (emphasis added.) USWA responds in its intervenor's brief to this court that "[i]t is well-settled, however, that the Board and this court will refrain from evaluating the content of campaign communication. . . . [T]he Board and this court assume that an employee is capable of weighing a document, its content, and its source." (Br., pp. 10, 11). Since the union apparently did not file a response to Gormac's objections, the Board assumed the truthfulness of these sworn assertions by the three employees, but ultimately found that as a matter of law, these allegations did not support a hearing, much less an overturning of the election.

■ We review the Board's denial of an evidentiary hearing for an abuse of discretion. *See NLRB v. Shrader's, Inc.*, 928 F.2d 194 (6th Cir.1991). Recently, in *Office Depot, Inc. v. NLRB*, 184 F.3d 506, 510 (6th Cir.1999), we held that "only when objecting parties show the existence of 'substantial and material factual issues' " is a hearing required, citing 29 C.F.R.

§ 102.69(d) and *NLRB v. Tennessee Packers, Frosty Morn Div.*, 379 F.2d 172, 177–78 (6th Cir.1967). *See also NLRB v. Basic Wire Prods.*, 516 F.2d 261, 263–64 (6th Cir.1975). However, "[o]ur mission is not to rubber-stamp the [Board's] order, no questions asked." *Shrader's*, 928 F.2d at 198. "Instead, in the course of determining whether the Board has abused the discretion entrusted to it by Congress to adjudicate representation disputes fairly, we must satisfy ourselves that the Board's order is the product of procedures which are fundamentally fair." *Id.*

■ In determining whether the allegations by the three employees demonstrate the existence of a "substantial and material factual issue," we must look to the circumstances in which we have previously overturned union elections or granted evidentiary hearings. We first note that "[a] party seeking to overturn the results of a representation election bears 'the burden of showing that the election was not conducted fairly,' " *see Maremont*, 177 F.3d at 577 (quoting *NLRB v. Superior Coatings, Inc.*, 839 F.2d 1178, 1180 (6th Cir.1988)), and that "[i]n order to satisfy the burden, the objecting party must demonstrate . . . 'unlawful conduct which interfered with employees' exercise of free choice to such an extent that it materially affected the result of the election.' " *Id.* (quoting *Shrader's, Inc.*, 928 F.2d at 196). It is well-settled that in cases where "no forgery can be proved, but *where the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth* and where their right to a free and fair choice will be affected," a new election is warranted. *Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d 343, 348 (6th Cir.1984), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985)(emphasis added).

In *NLRB v. Hub Plastics*, 52 F.3d 608, 612 (6th Cir.1995), another case where there was no Board hearing on the employer challenges, we expressed therein a particular concern with "the manner of the

misrepresentation," rather than its exact content. Moreover, we stated a principle there decidedly different from the Board's (and the union's) urging that we apply the *Midland* rule with only a very limited and cramped exception:

> *Van Dorn* and *Dayton Hudson* stand for the proposition that although employees naturally treat campaign propaganda with skepticism, on occasion a misrepresentation may be, though not a forgery, so artful that this skepticism is overcome, resulting in employees believing that the campaign propaganda must absolutely be true. Such a misrepresentation may also be so pervasive that it is likely to influence a large enough group of employees to have a material effect on the election.

*Id.* at 613.

The five factor test often used in deciding this kind of controversy was articulated in *Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1155 (6th Cir.1996). These factors are as follows: (1) the timing of the misrepresentation; (2) whether the employer was aware of the situation and had an opportunity to respond; (3) the extent of the misrepresentation; (4) whether the source of the misrepresentation was identified; and (5) whether there is evidence that employees "actually were affected" by the misrepresentation. Yet another factor that plays a part in our analysis is the closeness of the election; when the election is close, we will use great care in reviewing the case. *See Hub Plastics*, 52 F.3d at 613 ("When the election is a close one, we examine these inferences [of the Board] with great care."); *see also Colquest Energy, Inc. v. NLRB*, 965 F.2d 116, 122 (6th Cir.1992) (holding that the closeness of the election is an important consideration in determining whether the misconduct has a material impact on the fairness of the representation election).

We recognize that it is a "serious measure" to disturb the results of any election conducted by the Board. *See Mitchellace*, 90 F.3d at 1156. Here, however, we have before us only the question whether we should direct the Board to have a hearing on asserted serious union misrepresentations in a very close election in an election day scenario involving circulation of a petition purportedly false on its face. We do not determine at this juncture whether the election should be set aside.

### B.

Employing the above standards, we hold that Gormac did establish the existence of substantial and material factual issues, and thus, should have been granted a hearing by the NLRB. We come to this conclusion for three reasons. First, in applying the aforementioned five factor *Mitchellace* test, we find that the factors cut in favor of Gormac. Furthermore, the closeness of the election factor also weighs in favor of Gormac. Second, we find that Gormac made out a sufficient case that the pre-election polling conducted by the Union was improper and deceptive. Finally, we have examined other recent cases from this circuit, and we have found that in much less dubious circumstances than that here, hearings before the NLRB have been granted. We discuss each of these reasons in turn.

### 1. Five Factor Mitchellace Test

Four of the five factors articulated in *Mitchellace* cut in favor of Gormac. The first factor, timing, cuts heavily in favor of Gormac. The flyer at issue was made public a mere two to three hours before the election, and few cases deal with such a late alleged misrepresentation. Indeed, a *per se* rule requiring a new election has been adopted by the Board in cases where party representatives converse with prospective voters waiting in line to vote. *See Milchem, Inc.*, 170 N.L.R.B. 362, 363, 1968 WL 18776 (1968); *Dayton Hudson*, 987 F.2d at 363–364. Furthermore, the closer the election that inappropriate conduct occurs, the more serious it becomes. We have held that a misrepresentation made two days before the election warranted a new election, *see Hub Plastics*, 52 F.3d at

612–13, we have also so held, where there was a misrepresentation made seven hours before the polls opened, *see NLRB v. Superior Coatings, Inc.*, 839 F.2d 1178, 1182–83 (6th Cir.1988), or even the morning of the election, *see Mitchellace*, 90 F.3d at 1156. Timing by itself is not determinative, and all three of the aforementioned cases ultimately turned on the other factors.

Interrelated to the first factor is the second factor, whether the employer was aware of the communication and had an opportunity to respond. It is doubtful that Gormac even knew about the flyer at all before the election, considering it was posted just a couple of hours prior to the opening of the polls. In any event, it is clear that Gormac did not know that the flyer contained misrepresentations until the three employees came forward a few days after the election and told what they knew. This factor is significant because in a number of recent cases where this court upheld the Board's decision not to grant a new hearing, the employer did have a chance to respond. *See Maremont*, 177 F.3d at 579 ("Because Maremount had a chance to respond to the rumor, its allegedly misleading effects were reduced."); *Mitchellace*, 90 F.3d at 1156 ("Mitchellace knew about the fliers, and was able to distribute an effective counter-flier of its own."); *Superior Coatings*, 839 F.2d at 1182–83 (employer was aware of the representations and had an opportunity to dispel whatever misconception resulted).

Thus, this factor cuts in favor of Gormac as well.

Probably the most important factor is the third one, the extent of the misrepresentation. We hold that the extent of the misrepresentation here is serious because not one, but two misrepresentations were allegedly made by the union's representatives. The first misrepresentation was made to the three employees, when the union promised that their names would be kept confidential and that their signatures would be used only for the purpose of getting an election. Indeed, their signatures ended up being used for a much different purpose than they had envisioned. Though the three employees signed an authorization card which gave the NLRB permission to use their names on flyers, at no time did they agree to "vote yes" for the union or to allow their signatures to be used to encourage others to "vote yes.". The recent cases of *Maremont* and *Keeler Die Case v. NLRB*, 185 F.3d 535 (6th Cir.1999), are distinguishable in this way, since in both of those cases, employees did explicitly agree to "vote yes" (non-binding though it was) and to have their signatures used in a leaflet to let others know that they would "vote yes."[7] Even if the employees had signed this without the alleged promises of confidentiality, this action of using their signatures for purposes which they had not authorized would be highly suspect. Combined with the alleged promises of confi-

---

7. *See Maremont*, 177 F.3d at 575 ("The following language appeared at the top of every page of the petition, above the signature lines: Maremont Corporation has had years to improve our wages, benefits and working conditions and to treat us fairly. They have continuously failed to live up to their promises. Now it's time to give ourselves a chance through representation by the International Association of Machinists and Aerospace Workers. We have made a promise to vote YES on Election Day—August 9th. We have authorized the International Association of Machinists to use our names on handouts to encourage others to VOTE YES."); *Keeler*, 185 F.3d at 538 ("Here, the union, in an effort to ascertain the level of its support

among employees prior to the date of the election, simply asked employees to sign sheets that stated clearly at the top: 'We are the Union! We, the undersigned employees of Keeler Die Cast are voting YES on election day. We have heard all the company's arguments and accusations and we have listened to their promises. But we are standing up for ourselves, our families and our futures. YES for justice. YES for dignity. YES for a voice in our workplace.' Furthermore, the sheets contained the statement at the bottom, 'I understand that my signature will be used in a leaflet or in any other way that shows my commitment to taking charge of my own future.' ").

dentiality, which we take as true for the purposes of this appeal, the serious nature of the misrepresentations becomes clear.

The second misrepresentation was made to the electorate when the flyer with the three employees' names was posted stating that each of the signatories would vote yes. The significance of this misrepresentation is that it created a false sense of the extent of Union support, which we have found before to be "precisely the sort of pervasive misrepresentation and artful deception that ... could ... be the basis for setting aside an election." *Dayton Hudson, supra* at 367. Indeed, the Supreme Court has previously denounced actions that "paint a false portrait of employee support during its election campaign." *NLRB v. Savair Manufacturing Co.*, 414 U.S. 270, 277, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973), *quoted in Prudential Insurance Co. of America v. NLRB*, 529 F.2d 66, 69 (6th Cir.1976).[8] Thus, this second misrepresentation of creating a false sense of the extent of Union support is serious as well.[9] This third factor cuts in favor of Gormac. The fourth factor, whether the source of the misrepresentation was identified, cuts in favor of the union, since the flyer did state, albeit in small print, that the USWA was responsible for it.

The final factor, whether there is evidence that employees were affected by the misrepresentations, favors Gormac. As for the first misrepresentation, the three employees were obviously affected in that their signatures, which they had been promised would be confidential, were made public. As for the second misrepresentation, the false picture of the extent of Union support that was created in all probability had an impact on the election. In a stipulation for the election in this case before the union fired its late and unexpected "vote Yes" broadside, the first agreement of the parties was specifically:

> 1. **SECRET BALLOT.** A secret-ballot election shall be held under the supervision of the Regional Director in the unit defined below at the agreed time and place, under the Board's Rules and Regulations.

JA 24. Why a "secret ballot," and why was this of first importance? Simply because the integrity and confidentiality of *secret* voting is at the heart of a democratic society, and this includes industrial democracy as well. The "revelation" that a majority of identified employees *will be voting* a certain way in an election seems to us to be of substantial adverse effect in a secret ballot election, especially if the "revelation" is untrue.[10] The flyer represented, in effect, that the election was only a matter of verifying a demonstrated large union majority who were voting "yes" as evidenced by their own signatures—thirty-one out of an eligible voter total of forty-five. This indication that thirty-one of forty-five votes were committed to vote "yes"

---

8. The paragraph from which the above quotation was taken reads as follows:

> Whatever his true intentions, an employee who signs a recognition slip prior to an election is indicating to other workers that he supports the union. His outward manifestation of support often serves as a useful campaign tool in the union's hands to convince other employees to vote for the union, if only because many employees respect their coworkers' views on the unionization issue. By permitting the union to offer to waive an initiation fee for those employees signing a recognition slip prior to the election, the Board allows the union to buy endorsements and paint a false portrait of employee support during its election campaign.

*Savair Manufacturing,* 414 U.S. at 277, 94 S.Ct. 495.

9. It should be noted that it is unclear how many other employees, if any, had misrepresentations made to them in order to garner their signatures for the flyer. We do take note, though, of the fact that although there were thirty-one signatures on the flyer, only twenty ended up voting for the Union, a mere sixty-five percent of that listed in the leaflet. In our view, this is simply further evidence that a hearing should have been granted to Gormac.

10. This point goes hand in hand with our court's long-standing skepticism towards pre-election polling by either side, that we discuss in Part B(2), *infra.*

may well have influenced the six employees who did not vote. It is quite possible that these six voters saw the flyer, concluded that their vote would not matter since it was already a foregone conclusion that the Union would win, and decided not to vote. We also note that the sixth factor articulated in *Hub Plastics*, the closeness of the election, is significant.[11] Accordingly, an evidentiary hearing should have been granted to Gormac.

### 2. Pre–Election Polling

■ "Although pre-election polling by the union is not inherently coercive, an employer may successfully challenge a representation election if he shows that pre-election polling was coercive and in fact influenced the result of the election." *Kusan Manufacturing Co. v. NLRB*, 749 F.2d 362, 365 (6th Cir.1984) (citing *NLRB v. Claxton Manufacturing Co.*, 613 F.2d 1364 (5th Cir.1980)); see also *Keeler*, 185 F.3d at 538 ("Nevertheless, an employer may successfully challenge a representation election if he shows that pre-election polling by the union in fact was coercive and in fact influenced the result of the election.") (internal quotation marks and citation omitted). An employer is prohibited from conducting a pre-election poll at all. *See Keeler Die, supra* at 538. In *Keeler Die*, where we held that no showing of coercion had been made, the union maintained that it "attempted through the pre-election poll [a vote YES campaign] to gauge accurately the UAW's chances of ultimate success." *Id.* Furthermore, there were no misrepresentations made in order to get more employees to sign the authorization card, as occurred here. A far higher percentage of eligible workers voted in

*Keeler Die*; the election was not nearly as close; and the language on the "petition" was materially different. We hold that there was a prima facie showing of coercion here by the Union in its pre-election polling activities.

In cases where the circumstances were far less suspect, evidentiary hearings were granted to the employers by the Board. *See Keeler Die Cast, supra*; *Kusan, supra*; *Heinz Pet Products v. NLRB*, 156 F.3d 1229, 1998 WL 449771 (6th Cir.1998) (unpublished) (timing not as close to the election as that here; employer countered the misrepresentation; election not as close); *NLRB v. J.P. Transportation Co., Inc.*, 172 F.3d 49, 1998 WL 869984 (6th Cir. 1998) (unpublished) (election not as close; misrepresentation made to only a few employees); *Detroit Auto Auction, Inc. v. NLRB*, 1999 WL 435160 (6th Cir.1999) (unpublished) (election not as close; no allegations of misrepresentations, only vote-buying); *Shrader's, supra* (election not as close; no allegations of misrepresentations, only coercion); *Maremont, supra*; see also *NLRB v. Dickinson Press, Inc.*, 153 F.3d 282, 284 (6th Cir.1998); *NLRB v. Pinkerton's, Inc.*, 621 F.2d 1322, 1325 (6th Cir.1980). Thus, evidentiary hearings have been routinely granted to investigate allegations far less serious than those that were made here. Furthermore, the regional director nor the Board engaged in the type of analysis of the circumstances in this case that is required. In *Maremont*, we made reference to the specific findings of the hearing officer that conducted a hearing involving circumstances similar to, but distinguishable from,[12] the present case. Indeed, we even

---

11. One was later opened by the Regional Director of the NLRB to reveal an additional vote for the Union. Since that rendered the other three votes irrelevant, those ballots were not opened. It should be noted that the three unopened ballots were challenged by the Union, not Gormac.

12. The Board, just before oral argument, called our attention to *Maremont*, which involved a somewhat similar union leaflet. *Maremont* is distinguishable for several rea-

sons. In the first place, the union organizers in *Maremont* "solicited employees' signatures on a petition stating that the signing employees would 'Vote yes.' " Indeed, the signers "*made a promise* to vote YES on Election Day." *Maremont, supra* at 575 (emphasis added). There was other language of authority "to use our names on handouts to encourage others." *Id.* This language might eliminate the kind of challenge made in the instant case. The election was not close, and, more important, *there was a hearing* at which vari-

stated in *Maremont* that "we look to the facts of the present case to determine whether the petition in question in fact interfered with the employees' free and fair choice." *Maremont, supra* at 578. As in *Shrader's*, 928 F.2d at 198, the company did not receive a fair opportunity to present its case. Thus, just as we did in *Shrader's*, we find that "the objections and supporting affidavits submitted by the company made out a prima facie case for invalidating the election; therefore, no matter what evidence the regional director's 'investigation' produced, the company had clearly demonstrated that substantial and material facts were in dispute, and that proper resolution of the dispute demanded an evidentiary hearing." *Id.*

### III.

We are satisfied in this case that the Board abused its discretion and that it acted unfairly in denying a hearing in this case. We are satisfied that the issues are both substantial and material in a close election deserving careful examination by this court *and* by the Board. We recognize that Gormac bears the burden of establishing before the Board the contentions which it asserts prevented a free and fair election. We cannot agree with the Board, however, that even if Gormac's claims were taken as (or proposed to be) true, that no violation of the Act occurred. If, indeed, union representatives promised employees that their signing of the "petition" or card would be kept confidential, and/or that its purpose was merely to be used to *obtain* a fair election, or that their names would not be used as an affirmative final vote indication, then such use as was actually made by the union in this case would be a gross misrepresentation and a deliberately deceitful tactic. We would conclude, in such event—although we certainly do not infer or presume that it happened the way Gormac argues—that the union was guilty of pervasive deception and artful misrepresentation, akin to for-

gery, enough to interfere with the free and fair choice of the employees.

Because the analysis we engaged in above was not conducted by the Board or the regional director and because evidentiary hearings are routinely granted in cases involving far less serious allegations than those here, the NLRB abused its discretion in denying Gormac a hearing. Accordingly, we **REVERSE** and **REMAND** to the NLRB for a hearing on the issues raised and herein discussed.

GILMAN, Circuit Judge, dissenting.

As stated by this court in *Van Dorn Plastic Machinery Co. v. NLRB*, 736 F.2d 343, 348 (6th Cir.1984), the fact that a union makes misleading representations does not *per se* justify setting aside an election. Rather, we will set aside an election only in cases in which "the misrepresentation is so pervasive and the deception so artful that employees will be unable to separate truth from untruth and where their right to a free and fair choice will be affected." *Id.* Unlike the majority, I find no evidence that the Gormac employees were unable to recognize the pamphlet as anything other than union propaganda, or that the union's conduct " 'materially affected the result of the election.' " *Maremont Corp. v. NLRB*, 177 F.3d 573, 577 (6th Cir.1999) (quoting *NLRB v. Shrader's, Inc.*, 928 F.2d 194, 196 (6th Cir.1991)).

The majority opinion places significant weight on the five-factor test set forth in *Mitchellace, Inc. v. NLRB*, 90 F.3d 1150, 1155 (6th Cir.1996), and finds that four of the five factors weigh in favor of Gormac. I agree that the first two factors (the timing of the leaflet and Gormac's awareness) weigh in favor of Gormac, and that the timing of the leaflet appears particularly calculated to give the union the last word. The law is clear, however, that misleading conduct, without proof that such conduct affected the employees' free

ous employees noted on both sides with respect to whether there were inducements, or misrepresentations, about the purpose of the

"petition," or any cover-up of the pertinent language therein. The handbill in *Maremont* was circulated the day before the election.

and fair choice, is not grounds for setting aside an election. *See Midland Nat'l Life Ins. Co.*, 263 N.L.R.B. 127, 133, 1982 WL 23832 (1982) ("[W]e will no longer probe into the truth or falsity of the parties' campaign statements, and ... we will not set elections aside on the basis of misleading campaign statements").

In contrast, I find that the remaining *Mitchellace* factors weigh in favor of the union. I especially find it hard to believe that there was any "artful deception" in light of (a) the authorization cards signed by the employees, (b) the clearly identified source of the handout, and (c) the lack of evidence that the election results were actually affected by the leaflet. In fact, as noted by the majority in its footnote 9, only 20 of the 31 employees who signed the leaflet actually voted for the union. The fact that over 35% of those signing exercised their own judgment when it came time to cast their votes makes it difficult to believe that the petition interfered with the employees' free and fair choice, or that "the false picture of the extent of the Union support that was created in all probability had an impact on the election."

I further find this case indistinguishable in principle from *Maremont Corp. v. NLRB*, 177 F.3d 573 (6th Cir.1999), and *Keeler Die Cast v. NLRB*, 185 F.3d 535 (6th Cir.1999). In both of these cases, the employees explicitly agreed to "vote yes" for the union and to have their signatures used in a leaflet to let others know that they would do so. This court upheld the election in each case, finding that such a "vote yes" petition is neither *per se* coercive nor objectionable on the basis that it affects the employees' right to a free and fair choice. *See Maremont*, 177 F.3d at 578; *Keeler*, 185 F.3d at 538–39.

In the instant case, the Gormac employees signed authorization cards that expressed both their desire for the union to represent them and allowed the union to use their names in leaflets. (See footnote 5 in the majority opinion.) I frankly find it difficult to believe that this could be interpreted in any manner other than that they intended to "vote yes" for the union and had no objections to letting others know of that fact. Like the two prior cases, there is no evidence in the instant case to support Gormac's contention that the employees were threatened or coerced into signing the authorization cards or that the union leaflet affected the result of the election. As to the three employees now claiming that they were assured of confidentiality, there is no evidence that, even if what they say is true, the union's alleged misrepresentation substantially affected the outcome of the election.

On the other hand, the instant case is distinguishable from this court's earlier decision in *NLRB v. Shrader's, Inc.*, 928 F.2d 194 (6th Cir.1991). In that case, the court held that the employer presented a *prima facie* case for invalidating the union election on the grounds of improper coercion, thereby requiring an evidentiary hearing before the NLRB. The union in *Shrader's* was charged with distributing hats and T-shirts to the employees before and during voting periods as a bribe or reward for voting for the union. *See id.* at 196. The court held that these items were "sufficiently valuable and desirable in the eyes of the person to whom they are offered, to have the potential to influence that person's vote." *Id.* at 198. In contrast, there is no evidence in the instant case that the employees were offered any bribe or reward in exchange for their votes. The fact that an evidentiary hearing was required in *Shrader's*, therefore, does not necessitate such a hearing in the present case.

Finally, the fact that the NLRB has granted evidentiary hearings in other cases provides no basis to believe that it abused its discretion in declining to grant such a hearing in the instant case. A hearing is required only if Gormac is able to show the existence of "substantial and material factual issues." *Office Depot, Inc. v. NLRB*, 184 F.3d 506, 510 (6th Cir.1999) (quoting 29 C.F.R. § 102.69(d)). For the reasons stated above, I do not believe that

any such issues exist in this case. In any event, to the extent that this is a close question, we would be hard pressed to find that the Board abused its discretion in declining to hold an evidentiary hearing.

I would therefore affirm the decision of the NLRB. Footnotes